**James E. SWANN et al., Plaintiffs,**

**v.**

**CHARLOTTE–MECKLENBURG BOARD OF EDUCATION et al., Defendants.**

**Civ. No. 1974.**

United States District Court, W. D. North Carolina, Charlotte Division.

Feb. 24, 1975.

Julius L. Chambers, Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiffs.

William W. Sturges, Weinstein, Sturges, Odom, Bigger & Jonas, Charlotte, N. C., for defendants.

McMILLAN, District Judge.

### ORDER

Counsel for the plaintiffs have requested the court to allow fees for their services from September, 1968, when the case was re-opened, to the present time. In Bradley v. School Board of Richmond, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), the Supreme Court held that, without the previously required finding of "bad faith" or "obdurate obstinacy" on the part of defendants, reasonable fees should be awarded under 20 U.S.C. § 1617 to counsel for plaintiffs who win school desegregation cases. The new standard is a welcome one. Legal judgments against public servants should in general be based upon their acts, and the natural and probable consequences of their acts, rather than upon "bad" or "good" faith. The positions taken by strong men are usually positions they believe in, and "bad faith" in cases like this is an uncertain legal standard and often an illusion or just an epithet.

The court would prefer to wait to rule on the fee question until the customary occasion—the entry of a final order—but since school budget time is near and the fees in question are substantial, action now appears appropriate. Plaintiffs won the case and their counsel are entitled to a reasonable fee. The question is what fee is reasonable.

Pertinent factors in fixing fees include:

1. *The results obtained.*—The results obtained were excellent and constituted the total accomplishment of the aims of the suit. Except for the refusal of the court to find in the plaintiffs' favor at the first hearing on certain minor contentions regarding adequacy of physical plants and equipment and teacher quality, all of the substantial rulings in the entire six years of litigation were essentially in the plaintiffs' favor, and the result has been the complete desegregation of the Charlotte-Mecklenburg school system. The entire community, including the court, appears to share at last a hope that the system has, or will be given, enough support that this desegregation will be a stable fact. The plaintiffs won the case in the district court and in the Supreme Court, and, except for a momentary set back on the bussing issue they won in the Circuit Court, and they may fairly be considered as the winners rather than the losers of the litigation.

2. *The difficulty and novelty of the case.*—The case was difficult. The first and greatest hurdle was the district court. The judge, who was raised on a cotton farm which had been tended by slave labor in his grandfather's time,

started the case with the uninformed assumption that no active segregation was being practiced in the Charlotte-Mecklenburg schools, that the aims of the suit were extreme and unreasonable, and that a little bit of push was all that the Constitution required of the court. The plaintiffs, making extensive use of official records and public documents from the files of the school board, the census, the tax office, the zoning board, the street department and other public agencies, demonstrated that segregation in Charlotte was no accident and that it was still the systematic practice of the school administration and the community at large. These and other facts were thoroughly and professionally presented and carefully and informatively briefed, and they produced a reversal in the original attitude of the district court. It took the court a full year of dealing with the case to conclude finally that the incidental though emotional issue of bussing could not escape attention and should be decided, as it was, in favor of the protection rather than the denial of constitutional rights.

By the time the order to desegregate thoroughly had been made in February of 1970 the case had become a political football of nationwide attention, and virtually all of the most powerful organizations in the land were arrayed in opposition to the position of the plaintiffs. These included the President, his Attorney General and several other Cabinet members; most of Congress; the Governor and General Assembly of North Carolina; the Charlotte Chamber of Commerce; most organs of public opinion and news dissemination; virtually all local elected officials; and the school board itself. The Attorney General intervened on behalf of the defendants. Anti-bussing laws were passed. The school board majority adopted a "stone-walling" position; and up until the early part of 1974 almost nothing to accomplish desegregation was done by them except in reluctant compliance with unconditional orders of court.

Possibly related to the case, though the culprits were never apprehended, was the destruction by fire of the entire building and offices of the plaintiffs' counsel during the height of the controversy.

The decision of the case was simply an application of accepted constitutional principles to a hitherto unlitigated set of facts. It was not even the first case in which white pupils on a large scale were required by a federal court to attend schools they did not wish to attend; the case involving Greenville, South Carolina, a few weeks earlier, may have been the first such case. *Swann*, however, has been widely treated as the first "bussing" order, and Charlotte-Mecklenburg is the largest metropolitan school system which at that time had ever been completely desegregated by order of court. The case therefore presented considerable difficulty and novelty.

3. *Fees paid to opposing counsel.*— As of April 30, 1971, which was by no means near the end of the battle, fees paid to two of the three law firms which represented the school board for this particular case amounted to approximately $125,000.00. No supplemental statement has been supplied, but counsel have indicated informally that additional fees paid, exclusive of expenses, by the defendants to their counsel, as of early 1975, were $77,256.00. The total paid by the taxpayers for unsuccessful defense of the case, in addition to expenses, is thus over $200,000.00.

4. *Time and labor involved.*—Plaintiffs' counsel have submitted a partial statement of time devoted to certain particular items of work on the case which totals more than 2,700 hours. This partial statement, in outline form, only, occupies twenty pages, and does not cover a tremendous volume of correspondence nor the work of secretaries and para-legal employees, nor confer-

ences among plaintiffs' counsel themselves.

5. *Loss of other business.*—It goes without saying that representing plaintiffs in this case is bound to have cost plaintiffs' counsel a lot of representation of other people in other matters, and that such loss will continue into the indefinite future.

6. *Fees customarily charged for similar services.*—Obviously counsel for the defendants have charged more for similar though unsuccessful services than counsel for the plaintiffs will receive. Although minimum fee schedules are no longer in full vogue, hourly rates in federal courts run from $30 or $35 an hour up to two or three times that figure.

7. *Fixed or contingent fee* (American Bar Association Rule, Local Rule 14, Canon 12).—There was no evidence of a fixed contract by the named plaintiffs for a set fee. However, in other civil rights cases where counsel fees have been awarded, the courts have held that reasonable fees should be granted regardless of whether the individual plaintiffs were obligated to pay any fees, Miller v. Amusement Enterprises, Inc., 426 F.2d 534 (5th Cir. 1970), and regardless of whether the attorneys were salaried employees of a legal aid agency. Clark v. American Marine Corp., 320 F. Supp. 709 (E.D.La.1970), affirmed, 437 F.2d 959 (5th Cir. 1971). The local counsel for plaintiffs have been reimbursed their out-of-pocket expenses by the NAACP Legal Defense and Educational Fund, Inc., of New York City, a non-profit legal aid organization, which has as its primary purpose the advocacy of the rights of black people in the courts. The Legal Defense Fund has also compensated local counsel on a nom-

inal basis. It is doubtful that the amount plaintiffs' counsel have received in fees from the Legal Defense Fund would cover the secretarial assistance which was necessary for preparing the papers in this case.

8. *Reputation, experience and ability of plaintiffs' counsel.*—Plaintiffs' counsel are exceptional in all these particulars.

9. *Expenses and advancements.*—In addition to fees proper the court finds that the claim of plaintiffs' counsel for allowance of expenses in the amount of $29,072.33 is in order. There is no exception to this claim by the defendants; and that amount should be paid by defendants to plaintiffs' counsel in reimbursement for those expenses.

Plaintiffs have requested a fee in the amount of $204,237.50. An award of fees in that amount would be reasonable, but I would prefer to err on the conservative side in dealing with any fee question because I do not wish to contribute unnecessarily to the overpricing of litigation in this or any other court. Based on all the factors noted above, and all of the information contained in the file and in the plaintiffs' fee petitions which are incorporated herein by reference, I find that plaintiffs' counsel are entitled to a fee of $175,000.00 for their services through 1974, plus their actual expenses.

## ORDER

The court finds that counsel for plaintiffs are entitled to a fee of $175,000.00 which is reasonable for the services rendered to date, and directs that $175,000.00, plus expenses of $29,072.33, be paid by defendants as part of the costs of this action.