An appropriate Order will be entered.

Robert L. DOWELL, an infant under the age of 14 years of age, who sues by A. L. Dowell, his father and next friend, et al., Plaintiffs,

v.

The BOARD OF EDUCATION OF INDEPENDENT SCHOOL DISTRICT NO. 89 OF OKLAHOMA COUNTY, OKLAHOMA, a Public Body Corporate, et al., Defendants.

No. 9452.

United States District Court, W. D. Oklahoma.

March 26, 1976.

---

John W. Walker and Henry L. Jones, Jr., of Walker, Kaplan & Mays, Little Rock, Ark., and James M. Nabrit, III, New York City, for plaintiffs.

J. Harry Johnson, Oklahoma City, Okl., and Larry L. French of Edwards & French, Seminole, Okl., for defendants.

## MEMORANDUM OPINION

BOHANON, District Judge.

This cause is now before the Court on a Motion to Allow Attorney Fees to counsel for the plaintiffs herein.

The services for which payment is requested were primarily rendered after the Court of Appeals for the Tenth Circuit in *Board of Education of Oklahoma City Public Schools v. Dowell*, 375 F.2d 158 (C.A. 10 1967) had found:

"The record reflects very little actual desegregation of the school system between 1955 and the filing of this case." 375 F.2d at 163.

"Inherent in all of the points raised and argued here by appellants is the contention that at the time of the filing of this case there was no racial discrimination in the operation of the school system. That contention should be first considered. The question of the existence of racial discrimination necessarily goes hand in hand with the question of the good faith of the board in efforts to desegregate the system.

As we have pointed out, complete and compelled segregation and racial discrimination existed in the Oklahoma City School system at the time the Brown decision became the law of the land. It then became the duty of every school

board and school official 'to make a prompt and reasonable start toward full compliance' with the first Brown case.

.   .   .

.   .   .   .   .

.   .   . When the trial court here made such a finding and pointed out the areas of discrimination, it was the clear duty of the school authorities to promptly pursue such measures as would correct the unconstitutional practices.   .   .   .

.   .   .   .   .   .

.   .   . The board presented no plan, it only reiterated its general intention to correct some of the existing unlawful practices.  This was not compliance with the order of the court.   .   .   .

Because of the refusal of the board to take prompt substantial and affirmative action after the entering of the court's decree, without further action by the court, the aggrieved plaintiffs, even with a favorable decree from the court, were helpless in their efforts to protect their court-pronounced Constitutional rights." 375 F.2d at 164, 165.

The Court later noted in *Dowell v. Board of Education of Oklahoma City Public Schools*, 430 F.2d 865 at 868, 869 (C.A. 10 1970):

"He [the trial judge] has been faced with many unusually difficult situations in his enforcement of the mandates of the Supreme Court and has acted in an effective and skillful way.  The record in this and the related cases demonstrates that little or no action would have been taken by the Board of Education without his 'encouragement.' "

Finally it observed in approving the final plan of unification for the system:

"The plan now approved by the trial court is a direct attack on what is still fundamentally a dual system to desegregate it as rapidly as possible.  It was necessary for the trial court to adopt a comprehensive plan such as the one advanced by Dr. Finger in view of the fact that the school board did not come forward with an effective plan." *Dowell v. Board of Education of Oklahoma City*

*Public Schools*, 465 F.2d 1012 at 1015 (C.A. 10 1972)

The issue presented is the additional cost to the school district of the intransigence and bad faith of the defendant School Board in seeking to preserve and protect a dual school system in defiance of constitutional imperatives for a unitary system. Spurred by a press hostile to the constitutional concept of equal education for all children, the Board has pursued a deliberate course of delay, obstruction and evasion in the implementation of a unitary system. By its obstinate disregard of its constitutional responsibilities, it compelled the plaintiffs to claim, demand, struggle for and defend that which was constitutionally theirs.  Willing to expend and exhaust the resources of the school district in fruitless endeavors to frustrate plaintiffs' constitutional rights, the Board made necessary the very services by counsel for plaintiffs whose cost it now opposes.  The Board is responsible for its betrayal of the trust imposed by the citizens of the district.  The consequences of its wanton stewardship must not be borne alone by the very parties whose rights were denied.  Indeed, the vindication of their rights under the Constitution is necessarily an affirmation of the rights of every citizen and of benefit to all who respect and cherish the values of our Constitution.

## I.   THE HISTORICAL CONTEXT

This action was filed October 9, 1961, by John E. Green, attorney of Oklahoma City, and U. Simpson Tate of Wewoka, Oklahoma.  Mr. Green shortly thereafter withdrew as attorney for plaintiffs in order to accept the position of Assistant United States Attorney for the Western District of Oklahoma.  Mr. Tate continued as chief counsel until the time of his death in 1968.  In July, 1969, John W. Walker of Little Rock, Arkansas, became lead counsel for the plaintiffs with the able assistance of his associates who are also seeking compensation for their 6½ years of professional services. This was a very critical period in the development of plans to convert from a dual system to a unitary system.

On April 8, 1968, in an action encouraging to the Court, the Board had authorized the appointment of a Committee on Equality of Educational Opportunity in the Oklahoma City Public Schools. The Committee consisted of approximately 35 members representing various civic groups and other interested organizations and included teachers, citizens from each high school attendance area, bankers, church ministers, representatives from the Chamber of Commerce and members of the School Board staff. Mr. Foster Estes, President of the School Board, announced the appointment of Dr. Willis Wheat as Chairman of the Committee, and the Committee was given the following charge by the Board:

"The Oklahoma City Board of Education hereby reaffirms and declares that an equal educational opportunity for every pupil in the school district regardless of racial or ethnic background, is the policy of the school district, and that the creation of the advisory council is desirable for the orderly consideration and implementation of decisions affecting equality of educational opportunity.

(a) WHAT ARE THE BEST POLICIES, PROCEDURES AND PLANS FOR PROVIDING EQUAL EDUCATIONAL OPPORTUNITY FOR ALL PUPILS OF THE OKLAHOMA CITY PUBLIC SCHOOLS?

(b) WHAT CHANGES SHOULD BE MADE IN PRESENT POLICIES AND PROCEDURES? WHAT NEW POLICIES AND PROCEDURES, IF ANY, SHOULD BE ADOPTED?"

The Committee was to meet from time to time with the Oklahoma City Board of Education in order to present its ideas and to obtain clarification and guidance in connection with the specific task assigned to it. The problem identified for the Committee by the Board was "to provide equality of educational opportunity by:

(A) Integration of pupils in the Oklahoma City Public School District by such means as:

1. Consideration of boundary changes,
2. Consideration of new construction,

3. Consideration of enrollment policies.

(B) Specialized programs designed for equalizing educational opportunity within majority and minority schools;

(C) Other possibilities."

The Committee undertook its assignment with dedication and diligence and on April 3, 1969, submitted to the Board an extensive "Interim Report" calling for immediate action by the Board to deal with the more urgent problems. Specifically, it advised:

"We recommend that the Oklahoma City Board of Education take immediate action to improve the process of integration in the Harding-Northeast schools.

1. The administration and Board of Education should act and speak positively regarding the integration of the four schools. Such positive action should include:

a. A statement to all Oklahoma City Public School employees and to the public at large that the Board is determined to successfully complete the desegregation and integration of the four schools.

b. A meeting with administrators and teachers of the four school area for the purpose of reassuring them that the Board solidly supports them in their efforts.

c. A meeting with community leaders of the area for purposes of outlining aims and objectives and for enlisting their support and cooperation.

d. A meeting with the Advisory Committee for Equality of Educational Opportunity for purposes of defining Board decisions plans for action, and means by which the citizens committee can assist in educating and informing the public.

2. Emphasis should shift to the positive, successful aspects of school desegregation and integration as found in the four school areas. Undoubtedly, the stories that circulate most freely are those that are negative. What is needed is an aggressive public relations campaign which will throw the public

spotlight on what the community, faculty and students are accomplishing. 3. The Board should evaluate the effectiveness of the present administrative and teaching staff in the four school areas. Replace those who have not performed effectively with the strongest possible replacements.

We recommend that the Board of Education take immediate action to improve the racial balance of the student body at Harding Junior High School and at Northeast High School. Since the Oklahoma City Board of Education and administration possess the data to develop a desegregation plan, it is possible they have already developed defensible alternatives. If so, these plans should be announced immediately and implemented at the proper time. However, the Committee on Equality of Educational Opportunity believes that action is necessary now, and consequently, offers the following alternative courses of action to be considered by the Board of Education.

. . . . .

3. The Board should consider the following alternatives in descending priority until the desired white-Negro ratio is achieved:

. . . . .

f. Adjust the north boundary of Northeast High School northward sufficiently to attain the desired number of additional white students at Northeast.

and/or

Assign some or all junior high and senior high school students from the Wilson attendance area to Northeast and Harding. Assign some or all junior high and senior high students from the Linwood attendance area to Central and Classen.

and/or

Assign to Northeast and Harding junior and senior high students living in the Belle Isle and University Heights Elementary School districts.

and/or

Assign to Northeast and Harding junior and senior high students from the following areas:

(1) Students living between Lincoln Blvd. and Santa Fe and between N.E. 30th and N.E. 23 St.

(2) Students living south of 71st St. extended west to Pennsylvania Ave.

(3) Students living between Classen Blvd. and Pennsylvania Ave. and between N.W. 23rd St. and N.W. 29th St.

(4) Assign to Central and Classen students living between N.W. 19th St. and N.W. 10th St. and between May Ave. and Portland Ave.

g. Further boundary adjustments as necessary and feasible to attain the desired goal."

The Board gave a cold reception to the recommendations proposed by its own Citizens' Committee and accordingly on May 30, 1969, adopted and submitted to the Court its own "Plan for Desegregation and Integration of the Oklahoma City Public Schools for the year 1969–70." This Plan provided that the following steps would be taken by the Board:

1. Maintaining order and discipline;

2. Strict enforcement of regular attendance;

3. Strict enforcement of the attendance of students according to their legal residence;

4. Establishment of a school for students requiring special programs other than special education;

5. Support open housing;

6. Continue efforts to prevent the concentration of multiple housing units which would concentrate large numbers of the minority race in the Northeast section of Oklahoma City;

7. Request a policy statement from the Oklahoma Education Association, Oklahoma City Education Association and the Oklahoma City Classroom Teachers Association concerning their commitment and involvement in the desegregation and integration of the schools.

8. Sponsor legislation providing for a 7-member Board of Education representing 7 rather than 4 geographical areas, in order to provide for greater community participation of the Board and representation of the minority races;

9. Request that the Oklahoma State Legislative Council rewrite the State School Laws which relate to the transfer of pupils;

10. Request the Oklahoma County Superintendent of Schools to cease granting legal transfers from the Oklahoma City Public Schools;

11. Communicate regularly with the Superintendents of neighboring school districts asking that they not accept legal transfers from Oklahoma City Public Schools;

12. Work with institutions of higher learning in the development of teacher education programs which will prepare more effective teachers;

13. All staffs, including central office, to represent more than one race effective September, 1969;

14. Continue in-service education for teachers working with culturally deprived pupils, integrated staffs and student bodies;

15. Strengthen the curriculum by closing small elementary schools;

16. Develop and utilize multi-ethnic instructional material;

17. Cease charging pupil fares on existing transportation routes and provide transportation within the rules and regulations of the State Department of Education.

With reference to paired schools, the Plan stated:

"The Oklahoma City Board of Education believes that boundary changes suggested by the Committee in an attempt to achieve racial balance are not feasible at this time.

. . . . .

The Oklahoma City Board of Education has consistently expressed, and desires to maintain, its position of being opposed to the mandatory, or forced, busing of pu-

pils; that is requiring pupils to be transported from their neighborhood school to attend another school."

The Chairman of the Advisory Committee in a statement to the Board on June 19, 1969, noted:

"It is apparent by the May 30th statement issued by the Oklahoma City School Board that the Board has adopted certain policies which has in effect changed the charge that the School Board originally set forth to the Committee."

Thereafter, in July, 1969, the Court held a hearing on the May 30th Plan, at which time the School Board members were all in attendance. In his testimony to the Court, the Chairman of the Advisory Committee described the necessity of changing boundaries of the Northeast and Harding areas in order to further desegregate them and to prevent them from becoming resegregated schools. At the conclusion of the hearing the Court found that the May 30th proposed Plan was not a good-faith plan as it constituted nothing more than a freedom-of-choice plan. The Court then requested that the Board meet and reconsider the recommendations of its Committee on Equality of Educational Opportunity and thereafter prepare and submit to the Court a plan which would prevent Harding and Northeast from becoming resegregated schools. On August 1, 1969, the School Board submitted to the Court a supplement to its May 30th Plan, and the Court on the same day approved the Plan as supplemented and ordered that it be put into effect for the school year 1969–1970. It further directed the Board to file with the clerk on or before November 1, 1969, a comprehensive plan for the complete desegregation and integration of the Oklahoma City Public School System as to students, faculty and employees of all grades employed by the Oklahoma City School District.

At this point the litigation became extremely complex, and some affected patrons became very excited and vocal in their support of the School Board. The Court of Appeals had ordered certain neigh-

borhood school groups to be reinstated as intervenors in the District Court case. The intervenors proceeded to appeal from the Court's Order approving the School Board's May 30th Plan as supplemented and approved August 1, 1969, for the 1969–1970 school year. Before the appellate court, the defendant School Board abandoned its own plan and joined with the intervenors in condemning the trial court for disapproving the May 30th Plan and claiming that the supplemental plan approved August 1, 1969, was unwarranted and not within the jurisdiction or power of the trial court. Accordingly, in defending the supplemental plan for 1969–1970 the plaintiffs were confronted by the Board as an opponent and not as an ally as they might reasonably have expected for a plan originally conceived by the Board's own Committee and ultimately presented to the Court by official action of the Board. The Board's reversal and inconsistent stance gave color and texture to the intervenor's attack in the Court of Appeals, and there the neighborhood school intervenors and the School Board secured an Order vacating the Plan approved by the Court on August 1, 1969, and further ordering the trial court to fashion an Order in keeping with 42 U.S.C. § 2000c–6. The trial court then on August 13, 1969, reinstated the May 30th Plan as supplemented on August 1, from which Order the intervenors took a further appeal and were joined by the School Board. Thereafter on August 27, 1969, the Appeals Court reversed and vacated the Trial Court's Order of August 13 with directions to consider and adopt a full and comprehensive plan for the complete desegregation and integration of the Oklahoma City School System.

The frantic activity by the opponents of desegregation to delay the implementation of the Plan for the 1969–1970 school year was muted only when the plaintiffs obtained in the United States Supreme Court an Order by Justice William Brennan on September 3, 1969:

"UPON FURTHER CONSIDERATION of the motion submitted by the applicants to vacate the order of the United States Court of Appeals for the Tenth Circuit issued in this case on August 27, and to reinstate the order of the United States District Court for the Western District of Oklahoma issued on August 13, and of the opposition thereto,

IT IS ORDERED that my order of August 29 is superseded and the order of the United States Court of Appeals for the Tenth Circuit is vacated and the order of the United States District Court for the Western District of Oklahoma is reinstated provided a petition for a writ of certiorari is filed by the applicants within fifteen (15) days from the date of this order. Should such a petition be so timely filed, this order is to remain in effect pending this Court's action on the petition. In the event the petition for a writ of certiorari is denied, this order is to terminate automatically. Should the petition for a writ of certiorari be granted, this order is to continue in effect pending the issuance of the judgment of this Court."

On December 15, 1969, the Supreme Court per curiam formally vacated the circuit's August 27 Order stating:

"The Court of Appeals on August 27, 1969, instead of limiting relief to the requested stay, summarily vacated the district court's approval of the school board's proposal. . . . The burden on a school board is to desegregate an unconstitutional dual system at once."

The Board, in the meantime, had conceived and submitted on November 6, 1969, the "Cluster Plan" as its comprehensive plan for future years. Its approval by the Court resulted in further involved appeals in which the Board again demonstrated its bad faith by attempting to repudiate its own "Cluster Plan" and to revive the inadequate and rejected May 30th Plan. The Board declared to the court of appeals that the "May 30th, Freedom of Choice Plan" was the only plan it desired to implement. The Board advised:

"Although both the plaintiff Dowell and the defendant School Board are, technically, appellees on this appeal, they

are . . . maintaining different postures . . . . .

As previously indicated by the defendant school board in its brief . . . the school board wants, and prefers over the comprehensive desegregation involved on this appeal, what has been referred to as the May 30th Plan. The so-called May 30th Plan was originally designed only for the 1969–1970 school year. . . ."

On July 29, 1970, the circuit court approved the Cluster Plan in principle, but with injurious modifications.

The Court then considered it desirable to have a cooling period to see how the Cluster Plan, as approved and modified by the circuit court, would work and to wait further clarification of desegregation guidelines by the Supreme Court. Therefore, on August 21, 1970, the Court entered an Order, on its own motion, closing the case. The Board, when left to its own devices, proceeded to reincarnate the discredited Freedom of Choice Plan in critical departure from the approved Cluster Plan. On May 3, 1971, the Court reinstated the case.

With the approval of the Court, the School Board employed two disinterested experts in the field of desegregation, one from Cleveland, Ohio, and one from Washington, D. C., who timely presented their plan for the comprehensive further desegregation and integration of the entire Oklahoma City School System. The Court conducted hearings on the new Plan on September 21, November 18 and December 9, 1971. The Board, in these proceedings, true to form, sought to stand pat with the Cluster Plan as administered during the school year 1970–1971 and condemned the plan proposed by its consultants.

Confronted by the unwillingness of the Board to produce a plan that would work, it became incumbent upon the plaintiffs under the able leadership of John W. Walker to devise and present to the Court a satisfactory plan. The Court on February 1, 1972, approved the "Finger Plan" submitted by the plaintiffs after finding:

"The defendant School Board has presented no plan for the further desegregation of the Oklahoma City Public School System and it has in turn rejected a proposal by the Department of Health, Education and Welfare, the consultants' plan and the plaintiffs' plan. It has not considered presenting any alternative to the present plan. The Board simply prefers to continue with the plan currently being implemented. Its policy is designed to protect the 'neighborhood schools' and to keep desegregation on a voluntary basis. It rationalizes its intransigence on the constitutionally unsound basis that public opinion is opposed to any further desegregation.

. . . . . .

This litigation has been frustratingly interminable not because of insuperable difficulties of implementation of the commands of the Supreme Court of the United States and the Constitution of the United States, but because of the unpardonable recalcitrance of the defendant board and the Superintendent of Schools to come forward with a constitutional plan for the desegregation of the schools of this district."

The inevitable unsuccessful appeals to the Court of Appeals and the Supreme Court followed. Since then there have been problems, more litigation and more futile appeals by the Board but good progress has been made, and the Plan is proving effective and moving toward full constitutional compliance.

## II. THE LEGAL CONTEXT

This brief résumé of the tortuous struggle to achieve a constitutionally acceptable school system for the children of this district illustrates the great obstacles which Mr. Walker and his predecessors and associates have had to overcome. It is a sad tale characterized by obduracy, procrastination and deception by defendants School Board and Superintendent. In this historical context of defiance and bad faith, the attorneys are clearly entitled to be paid for their services which have been necessary, per-

fectly professional and exceptionally skilled and competent. Their research, pleading, preparation, presentation and argument in every step and stage of this proceeding have been compelled to bring about compliance with the commands of the Constitution for a nondiscriminatory school system.

20 U.S.C. § 1617 authorizes a federal court to award a reasonable attorney fee when appropriate in a school desegregation case. In construing this statute, the Supreme Court in *Northcross v. Board of Education of Memphis City Schools,* 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48, 50 (1973) held that:

> "[The successful plaintiff] should ordinarily recover an attorneys fee unless special circumstances would render such an award unjust."

In *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), the Court further held that it authorizes the award of counsel fees although services may have been rendered prior to the effective date of the act. Here defendants point to no exceptional circumstances, and there are none. Here it is true as well as in *Bradley*:

> "In this litigation the plaintiffs may be recognized as having rendered substantial service both to the Board itself, by bringing it into compliance with its constitutional mandate, and to the community at large by securing for it the benefits assumed to flow from a nondiscriminatory educational system." 416 U.S. at 718, 94 S.Ct. at 2019, 40 L.Ed.2d at 492.

Bereft of defenses upon the merits, the defendants have sought to find refuge in the supposed shelter of the Eleventh Amendment. This is not, however, in form or substance an action for the recovery of damages from the State. *Cf. Ford Motor Company v. Department of Treasury of Indiana,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). The award is merely the taxation of costs as authorized by the applicable federal statute cited. It is well established that costs may be taxed against the losing party even though it may be a State. *Fairmont Creamery Company v. Minnesota,* 275 U.S. 70, 77, 48 S.Ct. 97, 100, 72 L.Ed. 168, 171 (1927). The Eleventh Amendment forbids only those awards measured in terms of a "monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." *Edelman v. Jordan,* 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662, 676 (1974). The award of attorney fees under the circumstances here presented is not to provide compensation for violation of the substantive right but simply to pay, in justice, for valuable services found to have been rendered to the Board and the community. The bar of the Eleventh Amendment to the recovery of damages from a State does not extend to an award for attorney fees taxed as costs. *Thonen v. Jenkins,* 517 F.2d 3 (C.A. 4 1975). *Accord: Souza v. Travisono,* 512 F.2d 1137 (C.A. 1 1975); *Class v. Norton,* 505 F.2d 123 (C.A. 2 1974); *Jordan v. Fusari,* 496 F.2d 646 (C.A. 2 1974); *Brandenburger v. Thompson,* 494 F.2d 885 (C.A. 9 1974); *Sims v. Amos,* 340 F.Supp. 691 (M.D.Ala.1972), *aff'd summarily* 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972). *Contra: Jordan v. Gilligan,* 500 F.2d 701 (C.A. 6 1974); *Named Individual Members San Antonio Conservation Society v. Texas Highway Department,* 496 F.2d 1017 (C.A. 5 1974); *Skehan v. Board of Trustees of Bloomsburg State College,* 501 F.2d 31 (C.A. 3 1974).

Moreover, the school district in its position in this case is not the state or arm of the state within the meaning of the Eleventh Amendment. It is merely a political subdivision of the State and in *Hopkins v. Clemson College,* 221 U.S. 636, 645, 31 S.Ct. 654, 657, 55 L.Ed. 890, 895 (1911) the Supreme Court recognized that under the Eleventh Amendment:

> "[N]either public corporations nor political subdivisions are clothed with the immunity from suit which belongs to the State alone by virtue of its sovereignty."

In *Edelman, supra* at n. 12, the Supreme Court discussed its prior decision of *Griffin v. County School Board of Prince Edward County,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) as it relates to the Eleventh Amendment issue:

"The Court of Appeals considered the Court's decision in *Griffin v. School Board,* 377 U.S. 218, [84 S.Ct. 1226, 12 L.Ed.2d 256] (1964), to be of like import. But as may be seen from *Griffin's* citation of *Lincoln County v. Luning,* 133 U.S. 529, [10 S.Ct. 363, 33 L.Ed. 766] (1890), a county does not occupy the same position as a State for purposes of the Eleventh Amendment. See also *Moor v. County of Alameda,* 411 U.S. 693, [93 S.Ct. 1785, 36 L.Ed.2d 596] (1973). The fact that the county policies executed by the county officials in *Griffin* were subject to the commands of the Fourteenth Amendment, but the county was not able to invoke the protection of the Eleventh Amendment, is no more than a recognition of the long-established rule that while county action is generally state action for purposes of the Fourteenth Amendment, a county defendant is not necessarily a state defendant for purposes of the Eleventh Amendment."

There is no Eleventh Amendment impediment to a federal court awarding attorney fees against a school district and its officials. *See Incarcerated Men of Allen County Jail v. Fair,* 507 F.2d 281 (C.A. 6 1974).

### III. STANDARDS FOR AWARD

Having concluded that the plaintiffs are entitled to an award for attorney fees, there remains only for determination the basis and the amount. The standards for the award of attorney fees are generally well recognized. An accepted statement appears in *In re Osofsky,* 50 F.2d 925, 927 (S.D.N.Y.1931):

". . . (1) The time which was fairly and properly to be used in dealing with the case; because this represents the amount of work necessary. (2) The quality of skill which the situation facing the attorney demanded. (3) The skill employed in meeting that situation. (4) The amount involved; because that determines the risk of the client and the commensurate responsibility of the lawyer. (5) The result of the case, because that determines the real benefit to the client. (6) The eminence of the lawyer at the bar, or in the specialty in which he may be practicing."

*Accord: Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–720 (C.A. 5 1974); *Chromalloy American Corporation v. Alloy Surfaces Co., Inc.,* 353 F.Supp. 429 (D.Del.1973); *Clark v. American Marine Corporation,* 320 F.Supp. 709 (E.D.La.), *aff'd* 437 F.2d 959 (C.A. 5 1971); *United States v. Gray,* 319 F.Supp. 871 (D.R.I. 1970); Canons of Professional Ethics, American Bar Association (Canon 12); Code of Professional Responsibility, Ethical Consideration No. 2–18 ("A.B.A. Code") and Disciplinary Rule 2–106B ("A.B.A. Rule"), American Bar Association. The Court has further reviewed *Swann v. Charlotte-Mecklenburg Board of Education,* 66 F.R.D. 483 (W.D.N.C.1975); *Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal.1974) which relate to the proper award of attorney fees.

This case is analogous in many ways to the history of the *Swann* litigation. First, the case has been vigorously contested at every stage, frequently in a hostile and resentful environment. Second, each involved numerous hearings over protracted periods of time. Third, the case established important new precedents in the Supreme Court and Court of Appeals. Fourth, the final plan (developed by the same expert as in *Swann*) was comprehensive and workable. Fifth, the school district acted in bad faith at all stages of the litigation. In *Swann* the trial judge set the fee for plaintiff's counsel at $65.00 per hour and approved a total award of approximately $175,000.00. It would appear, however, that this case may well have involved far more lawyer and judicial energy than *Swann.* Here, there have been at least five Petitions for Certiorari filed since 1967. The lawyers for the School Board and intervening partners in opposition to desegregation have been numerous and have included many leading members of the local bar. The litigation has at times been so frantic and complex that counsel for the plaintiffs have been called upon in all three levels of the federal judicial system at the same time to respond to novel and confusing legal

contentions. Moreover, an appeals court judge in a sensitive situation was recused from further participation in the case.

## IV. SPECIFIC FINDINGS

In its hearing on the instant motion on January 15, 1976, the Court heard the testimony of John W. Walker and attorney John P. Sizemore, a civil rights expert from Washington, D. C. Admitted in evidence were 32 exhibits, briefs of the parties and the entire record of the proceedings before this Court from 1967 to date. The defendant School Board offered no evidence and made no defense upon the facts but relied solely upon its untenable argument of its immunity under the Eleventh Amendment. The record of the services performed and their value is uncontradicted. The defendant School Board produced not a single expert or other witness to challenge the plaintiffs' evidence, nor otherwise submitted any documentary or other evidence to establish any basis to refute plaintiffs' claim. Speculation, skepticism, and argument can never be a substitute for evidence. Based upon the complete and unrefuted record, the Court, therefore, finds:

### A. Claim of John W. Walker

Mr. Walker is a graduate of Arkansas AM&N College, B.A.1958; New York University (M.A.1961) and Yale Law School (1964). He was admitted to practice law by the bar of Arkansas in August, 1964. He is admitted to practice in the Supreme Court and in the Courts of Appeals of the Tenth, Eighth and Fifth Circuits and numerous District Courts in Texas, Oklahoma and Arkansas. Mr. Walker has handled numerous civil rights cases in Arkansas, Texas, Oklahoma, Louisiana and Tennessee, several of which were ultimately resolved by the Supreme Court. He has been continuously involved as the lead counsel of record herein from July, 1969, until the present. During the past 6½ years this case has consumed far more of his time than any other occupational endeavor. He has devoted a minimum of 2,488 hours to this case. His preoccupation with his representation here-

in has necessarily precluded him from working on other legal work or from taking on new work. As attorney for plaintiffs in this case involving novel and complex issues, Mr. Walker had the difficult task of proving every aspect of the constitutional violations which were present in this very large school district. He had to collect and present important evidence on issues such as school capacities, zone lines, the effect of transfer policies, employment practices, the current plan of desegregation and many others. Then when he had established the constitutional violations, in the face of the Board's obstinate refusal to take necessary curative action he was required to litigate each detail of the appropriate remedy. The results achieved through the exercise of his efforts have been tremendous and it would be impossible to calculate their value in any monetary terms.

The Court specifically finds that the time expended by Mr. Walker far exceeds the documented time of 2,488 hours and that the reasonable value of his services during the period from 1969 to date on an hourly basis would be in the range of $40 to $70. It further concludes that he should be paid for his services in this case to date the sum of $155,000.00 which is a necessary and reasonable amount. Mr. Walker testified that he had previously been paid for his services in this case $5,000.00 by a third party. Therefore, the Court has deducted from the $155,000.00 allowed the $5,000.00 previously paid Mr. Walker, leaving a net sum of $150,000.00 to be paid by defendants herein.

### B. Claim of James M. Nabrit, III

Mr. Nabrit is a graduate of Bates College and Yale Law School and was admitted to practice in the District of Columbia in 1955. From 1955 to 1956 and 1958 to 1959 he was engaged in the general practice of law in Washington, D. C. Since 1959 he has been employed as a staff attorney and subsequently as associate counsel of the NAACP Legal Defense and Educational Fund, Inc. In this capacity he has been engaged primarily in civil rights litigation in the federal courts throughout the United States. He

has argued the following school desegregation cases before the Supreme Court of the United States: *Monroe v. Board of Commissioners,* 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); *Swann v. Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Board of Education v. Swann,* 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). From time to time he has participated as one of plaintiffs' counsel herein. This has consisted mainly of attorneys in the case. He has spent no less than 320 hours in conference and briefings in connection with this case.

In his affidavit Mr. Nabrit explains that the NAACP Legal Defense and Educational Fun, Inc., is a non-profit organization engaged in providing legal assistance in civil rights matters without charge to clients it represents. The Legal Defense Fund has been approved to function as a legal aid organization by the New York court; however, the relevant court order provides the Legal Defense Fund may receive fees awarded by courts. Legal Defense Fund staff attorneys, including claimant, are salaried and do not receive any portion of such award. Various courts have awarded fees to the Legal Defense Fund. *See, e. g. Clark v. American Marine Corporation,* 320 F.Supp. 709, 711 (E.D.La.1970), *aff'd* 437 F.2d 959 (C.A. 5 1971); *Miller v. Amusement Enterprises, Inc.,* 426 F.2d 534 (C.A. 5 1970). The Court specifically finds that the 320 hours documented by Mr. Nabrit is a conservative estimate of his time spent on this case and that the reasonable value of his services during the appropriate time span on an hourly basis would be in the range of $50 to $70. It further concludes that he should be paid for his services in this case to date the sum of $17,000.00 which is a necessary and reasonable amount and which sum will be paid to the NAACP Legal Defense and Educational Fund, Inc. as requested by Mr. Nabrit.

### C. Claim of Henry L. Jones, Jr.

Mr. Henry L. Jones is a member of the law firm of Walker, Kaplan & Mays, P.A.

He graduated from Yale College and the University of Michigan School of Law and was admitted to practice in Arkansas in 1972. He has served as law clerk to the Honorable G. Thomas Eisele of the United States District Court for the Eastern District of Arkansas from June, 1972, through May, 1973, and thereafter as law clerk to the Honorable Gerald W. Heaney, United States Court of Appeals for the Eighth Circuit from June, 1973, through June, 1974. He joined Mr. Walker's law firm July 1, 1974, and has spent 83 hours assistance upon this case. The Court finds that the reasonable value of his services on an hourly basis as a junior attorney would be $50. It further concludes that he should be paid for his services in this case to date the sum of $4,150.00, which is a necessary and reasonable amount.

### D. Claim of Archibald B. Hill, Jr.

Mr. Archibald B. Hill, Jr., has filed his statement of services rendered wherein he alleges that he has been associate counsel for the plaintiffs in this cause since 1967; that he has made numerous court appearances for which extensive preparation was required; that he has had numerous conferences with witnesses and principles and due to the hostility of the community engendered by the school officials' conduct, he, being local counsel, has spent countless hours consulting with various school officials, teachers, patrons, community leaders and others in this matter. The claimant further states that a conservative estimate of his time spent would be in excess of 450 hours and asks the Court to allow a proper attorney fee for his services in this cause. His claim was not supported by testimony or affidavit. Mr. Hill does not indicate in any way what a reasonable attorney fee would be for the services he claims he performed, nor is there any credible proof of the number of hours that he spent in the interest of plaintiff in this case. Under the circumstances the Court concludes that his claim is not substantiated, and it will, therefore, be denied.

### E.  Claim of R. Sylvia Drew

Ms. R. Sylvia Drew has not submitted an affidavit to the Court setting out the professional services she performed or the time expended, nor did she present any evidence on her claim at the hearing.  Mr. Walker has filed a statement regarding the services performed and estimated time expended by Ms. Drew in connection with the prosecution of plaintiffs' case.  He states that her time involved has been very extensive; that she was present for and participated in most of the district court and appellate court hearings, making several of the oral arguments in the latter.  He states that her effective time involvement, not including travel time between New York and Oklahoma City and Denver, is at least twice that of associate counsel, James M. Nabrit, III.  Mr. Walker submits that a conservative time estimate for Ms. Drew is 600 hours including travel time.  In connection with Ms. Drew's claim, the Court recognizes that she was helpful to Mr. Walker in the prosecution of this case and assisted him on several occasions with court appearances and oral argument.  Notwithstanding this, the Court finds that there is no evidence which would satisfy the applicable standards to support any award in her favor. The award made in favor of Mr. Walker may be used in part, should he be inclined to do so, to compensate Ms. Drew for the aid and assistance she has given him.  The Court has observed her presence and nothing more, and since the proof in support of her claim is far short of that required for the Court to award her compensation, her claim will be denied.

### F.  Other Attorneys

As pointed out in the historical statement of the case, Mr. John E. Green and Mr. U. Simpson Tate originally represented the plaintiffs at the inception of this action. Though he rendered important services in the prosecution of this case, Mr. Green makes no claim for attorney fees.  Mr. Tate is now deceased and the Court has no properly documented and supported claim for the payment of attorney fees to him herein.

However, the Court finds and holds that Mr. Green and Mr. Tate have performed valuable services herein by requiring the defendants to begin in earnest to follow the guidelines of the Constitution of the United States to desegregate the dual school system which was and had been maintained for so many years before the filing and prosecution of the Complaint herein.  Although the Court regrets that it is unable to enter an Order to pay to Mr. Tate's estate any sum of money for the valuable services he rendered to the plaintiffs, the Court knows that he was the type of skillful, conscientious and learned counsel who would perform these services as a private citizen and officer of the Court for the good of the public.  The action of Mr. Tate and Mr. Green comports with the highest mandate of the legal profession.  Mr. Green can, and certainly Mr. Tate would, if he were living, take pride in the knowledge that they have contributed to the current program of equal educational opportunity in the Oklahoma City Public Schools.

For the reasons previously stated herein, the Court finds specifically as follows:

1.  That attorney fees to date, to be taxed as costs, are awarded to counsel for the plaintiffs as set out below:

John W. Walker _____ $150,000.00
($155,000 less $5,000 paid by third party)

James M. Nabrit, III _____ $ 17,000.00
(to be paid to the NAACP Legal Defense and Educational Fund, Inc.)

Henry L. Jones, Jr. _____ $  4,150.00

2.  That all other claims for services heretofore rendered by any attorney for plaintiffs are denied and forever barred.

3.  Mr. John W. Walker is the attorney of record for plaintiffs herein and he is hereby authorized to render such further services in support of plaintiffs' cause as may be necessary for the accomplishment of a unitary system and the final disposition of this cause.  In that event, however, he is directed to file a monthly statement of fees as they accrue in order that the defendant School Board will be constantly aware of the expenses to be incurred by it should it

fail to comply with the constitutional provisions for a nondiscriminatory school system.

Accordingly, a proper Judgment will be so entered.