**Robert A. REED, et al., Plaintiffs,**

v.

**James A. RHODES, et al., Defendants.**

**No. 1:73 CV 1300.**

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 1, 1996.

Thomas I. Atkins, Brooklyn, NY, James L. Hardiman, Cleveland, Ohio, David W. Whitaker, Beachwood, Ohio, for plaintiffs.

Wanda Rembert Arnold, Cleveland Board of Education, Law Department, Cleveland, Ohio, for local defendants.

Stephen M. O'Bryan, Margaret Anne Cannon Kelley, McCann & Livingston, Cleveland, Ohio, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for state defendants.

## ORDER

KRUPANSKY, Circuit Judge, Sitting by Designation.

Thomas I. Atkins, Esq. (Atkins), 135 Eastern Parkway, Suite 11–B–1, Brooklyn, New York 11233, one of the attorneys of record for the plaintiffs in this class desegregation action that has been pending for approximately twenty three years, has filed two motions with this Court. The first is styled Motion to Recuse, Pursuant to 28 U.S.C. 455(a), and the second is styled Motion to Vacate and Rescind Receivership Order.

At the outset, it should be noted that, although the Cleveland School District during the 3½ years immediately preceding this Court's decision of March 3, 1995, while under the direction and management of the "reform" Cleveland Board of Education, escalated its indebtedness from approximately $35 million to an unprecedented irreversible indebtedness of $140 or more million, virtually destroyed its credit rating and fiscal credibility with the State of Ohio Board of Control and financial institutions generally, while engaged in a pattern of deficit spending exceeding $70 million annually and was, on the above date, insolvent, facing a $30 million shortfall required to meet its daily operating expenses and salary commitments until June 30, 1995, the end of its fiscal year,[1] was not

1. The gravity of the documented administrative and fiscal mismanagement of the Cleveland School District by the Cleveland School Board during the 3½ years immediately preceding this Court's Order of March 3, 1995, and the resultant annual financial drain of magnitude imposed upon Ohio's revenues and budget, prompted the Ohio State Legislature to enact special legislation delegating extraordinary, wide-ranging authority to the Auditor of State *ordering him* to conduct a selective *performance audit* of the District's finances and performance, which is presently in progress with a projected completion date in April, 1996.

In contrast to the soaring expenditures within the District by the close of the 1994 school year, the student absentee rate in grades 9 through 12 increased to 29% (from Cleveland Public Schools

Report: "Attendance Rates 1989–90 through 1993–94"); the cohort student dropout rate in grades 10 through 12 rose to 35% (from District Periodic Status Report (PSR) Specification 2b); the 9th to 10th grade non-promotion rate was 42% of the total enrollment of those grades, which rate rose to 61% by the end of the 1994–95 school year in June of 1995 (from Cleveland City School District 2A–Promotes/Nonpromotes Annual Report(s) for Academic Year(s) 1993–94 and 1994–95); the 10th to 11th grade non-promotion rate was approximately 32%, which rose to 38% by the end of the 1994–95 school year in June, 1995 (*id.*); the 11th to 12th grade non-promotion rate was approximately 25%, which non-promotion rate rose to 31% by the end of the following school year in 1995 (*id.*); and demonstrated student proficiency (predicated upon the results of the March, 1995 4th grade proficiency test) of

and has not been placed into receivership by this Court. Receivership, pursuant to Ohio Revised Code § 3313.483 *et seq.,* is an option reserved to the discretion of the State Board of Education upon certification by the State Auditor.

Accordingly, the Court will consider the Atkins pleading as a motion to vacate its March 3, 1995 Order directing the State Board of Education, by and through its Superintendent of Public Instruction, to assume and exercise the authority and responsibility invested in it by the Ohio Constitution, its duly-enacted statutes, and the Court's desegregation orders and consent decrees dating from 5/16/79.

Because both motions are anchored in common, factually unsupported, and conclusory assertions and misstatements that tax the rudimentary dictates of responsible pleading, which counsel knew or should have known "after an inquiry, reasonable under the circumstances," Rule 11(b), Federal Rules of Civil Procedure, to be self-discrediting hearsay, conjecture, imaginative editorialized commentary and speculation,[2] the motions shall be considered in tandem.

As prologue, a resumé of events since the untimely demise of Judge Frank J. Battisti, who presided over the evolution of this school desegregation case since its inception on December 12, 1973, is timely and helpful to posture it into a meaningful context.

In October of 1994, and for a number of years prior thereto, the United States District Court for the Northern District of Ohio was confronted with a ballooning case docket as a result of multiple judicial vacancies. In early 1994, two newly-appointed judges were entering upon their duties and engaged in organizing chambers, recruiting law clerks and other staff, and familiarizing themselves

with their newly-assigned cases. The sudden death of Judge Battisti, coupled with the then chief judge's announced retirement, aggravated an already critical docket situation. As a Sixth Circuit Court of Appeals judge on senior status, who enjoyed the benefits of reduced court of appeals case assignments, this judge accepted the stewardship of Judge Battisti's approximately 194 outstanding cases, including the Cleveland School District desegregation case. From all information available at that time, the school desegregation case was essentially dormant. It was anticipated that it would require minimal judicial monitoring of a consent decree between the parties which had been approved by Judge Battisti on May 24, 1994. The consent decree was calculated to ultimately result in a declaration of total unitary status of the School District within three to seven years and a final disposition of the desegregation case which had been pending for the last 23 years.

The stewardship of the Battisti docket was subject to the conditions that:

1. the active judges of the district court unanimously approved the stewardship; and

2. the Sixth Circuit Judicial Counsel approved the stewardship; and

3. Judge Battisti's entire staff, including his law clerks, and his chambers be made available to implement the stewardship.

All conditions having been approved, this judge entered upon organizing and processing the entire Battisti docket.

The first three months of the stewardship were uneventful. The school desegregation case, at least on the surface and within the Court's knowledge, remained dormant, requiring virtually no judicial monitoring be-

Ohio large urban school districts reached the lowest level in the state (from Cleveland Public Schools Report: "Fourth Grade Proficiency Test Results", 6/28/95).

2. A review of Plaintiffs' Application for Fees and Costs of Thomas I. Atkins filed on September 15, 1995 reflects that Atkins has visited the Cleveland area on but two occasions during the fifteen months of this Court's stewardship of the late Judge Frank J. Battisti's docket which began in

October of 1994. Apart from his attendance at a single court hearing on November 10, 1994 and a conference between various state school board administrative personnel and their legal counsel on April 4, 1995, his participation in this desegregation proceeding has been limited exclusively to long distance teleconferencing from his apartment in Brooklyn, New York with his local co-counsel, other involved lawyers and individuals—a practice which manifests the hearsay characteristics of his information sources.

yond attending one or two minor inconsequential controversies. Other cases on the Battisti docket were being routinely addressed and disposed of.

On November 8, 1994, after Cleveland voters had expressed a lack of confidence in the three-year performance of the "reform" Board of Education by rejecting, for the second time during that year,[3] a well-financed 9–mill school operating levy by a 3 to 2 dissapproval vote, underlying differences began to surface between charismatic local school superintendent Dr. Sammie Campbell Parrish, the creator of the community acclaimed, innovative educational program which was a keystone of the May 24, 1994 consent decree, and a mayor-school board alliance.

During the ensuing days, the schism between the superintendent and the mayor-school board coalition was becoming more notorious and progressively more strident. It culminated in open acrimonious conflict in mid November, 1994 when the mayor arranged a closed-door executive session with the entire board, which convened on November 16, ostensibly to discuss legal strategy in the desegregation proceedings, from which Dr. Parrish was reportedly intentionally excluded.[4] It was later disclosed that although

*Reed v. Rhodes* has been alluded to during the meeting, its primary purpose was to address buildings and the district's property management plan, possible collaboration with the Catholic Diocese, vouchers, charter schools, and restoring "civility to the educational process," all subjects within the delegated responsibility of the superintendent which were more appropriately addressed at public board meetings under Ohio's Sunshine Laws.[5]

Although the Court was becoming increasingly apprehensive and concerned that the antagonists were jeopardizing the school district's fiscal and administrative capability to implement the various desegregation remedial decrees and the Consent Decree of May 24, 1994, it avoided involvement. However, when Dr. Parrish, after signing a two-year extension of her contract, abruptly announced, in the wake of resignations by her Deputy Superintendent of Educational Services and her Deputy Administrator of Support Services, that she was resigning and departing Cleveland on March 3, 1995, citing, among other reasons, the "highly publicized falling-out with Mayor Michael R. White," Scott Stephens and Patrice M. Jones, *Parrish Quits to Return to North Carolina*, **The**

---

**3.** The first board-supported operating levy had been defeated five months earlier on May 23, 1994.

**4.** The mayor publicly implied that Dr. Parrish and her administrators lacked assertiveness, were inattentive to their management responsibilities, and were not aggressive in reforming the school system. He opined that "the public had the perception that school officials were not driving reform of the system.... 'It's time to break glass.'" **The Plain Dealer**, November 17, 1994 at 1A.

Parrish charged the mayor and the board with political interference with her duties, disrupting the operation of the entire school system in an effort to discredit her. She asserted that she spoke out about her exclusion from the closed-door meeting because she felt that she had been "painted into a corner." **The Plain Dealer**, November 18, 1994 at 1A. She went on to say that:
"Obviously there is a political meeting going on [The closed-door mayor-board session of November 16, 1994] because if it was an educational meeting, I should be there."
The mayor's actions "make it seem as if he was waiting in the wings for the levy to fail so he could come out with these statements."

Parrish stated that she had "one luxury the mayor and the other elected officials on this board don't have. I don't have to do things for political gain, for ego or for longevity.... I can do what's right, and I will continue to do that."
Characterizing the mayor's statement regarding 'breaking glass', Parrish said "[It] sounds a little bit like doing something for public relations.... I won't do that."
"The mayor is a good person, but I am beginning to believe that I overestimated his understanding of education reform."
(All of the foregoing quotes are from Patrice M. Jones and Scott Stevens, *Parrish Not Invited to Meeting on Schools*, **The Plain Dealer**, Nov. 17, 1994 at 1A.)

**5.** A state court concluded that the closed door executive session of the board had not violated Ohio's open meeting law because those present briefly discussed the desegregation case. However, the judge admonished that "It probably wasn't very good judgment," and "He, White, has no control over the board and he should keep his hands off the board."

**Plain Dealer,** Feb. 17, 1995 at 1A, coupled · with rumors that the school board had exhausted its half billion dollar budget and was confronted with a multi-million dollar shortfall to meet its daily operating and salary expenses for the balance of its fiscal year ending on June 30, 1995, the Court noticed a hearing to convene on February 24, 1995, to determine by direct evidence the fiscal and administrative capability of the Cleveland School District and its Board of Education to meet its responsibilities to implement the various outstanding desegregation remedial orders and consent decrees.

The Court hearing proceeded at the scheduled time with all parties present and represented by legal counsel. Counsel were afforded the opportunity to present evidence or, within their discretion, formal statements addressing the fiscal solvency of the district and its administrative capabilities to implement its educational commitments imposed by the Court's various desegregation remedial orders and its consent decree of February 24, 1995, and any contingency plan(s) it was prepared to initiate to correct existing fiscal and/or administrative deficiencies.

At the conclusion of the hearings on February 24, 1995, mindful of a pending local school board motion which had been filed on January 5, 1995 styled Motion for Declaration of Partial Unitary Status for Student Component of the Remedial Order and for Modification of the consent decree of May 24, 1994, the Court recognized that its judicial disposition was confronted with two separate, distinct, and essentially unrelated inquiries that required timely consideration and disposition.

The first was distinctively legal, seeking a judicial resolution of the issues joined by the January 5, 1995 local school board motion requesting incremental unitary status for the student component of the Court's various desegregation remedial orders, and for a

modification of its Consent Decree of May 24, 1994.[6]

The second was singularly administrative, demanding immediate decisive attention of academically trained professional fiscal, business, and educational consultants and business managers with the demonstrated ability and expertise required to successfully financially stabilize, restructure, reorganize, and revitalize a bankrupt enterprise, in this instance, a school district, and restore its *FINANCIAL* and *ADMINISTRATIVE CAPABILITY* to implement its responsibility to provide qualitative education for its students and honor its court-imposed desegregation remedial order commitments.

To ensure against future confusion between its purely legal responsibilities and its collateral oversight effort to restore the School District's fiscal and administrative capabilities to meet its responsibilities, the Court isolated one from the other by two separate court orders issued on March 3, 1995.

In one order, Daniel J. McMullen[7] was appointed a Special Master to conduct hearings and consider the *SUBSTANTIVE LEGAL ISSUES* that had been joined by the local school board's Motion for Declaration of Partial Unitary Status for the Student Assignment Component of the Remedial Order, and for Modification of the May 24, 1994 Consent Decree, *i.e.,* controlled or open parental choice of student school assignments, *vis-a-vis* mathematically computed and intransigently imposed building student assignments predicated upon a formula of plus or minus 15% from 70% African–American.

At the conclusion of the judicial proceeding that had commenced on February 24, 1995 to consider the financial and management capabilities of the school district to implement its court-imposed desegregation responsibilities, which Atkins did not attend, the evidence

---

6.  The parties requested a judicial resolution by mid May, 1995 to provide the School District with sufficient lead time to administratively conform its 1995–96 student assignments and interrelated busing schedules for the school year beginning in late August of 1995 with any Court decision that would result from a disposition of the joined issues.

7.  Daniel J. McMullen, a Harvard Law School graduate, was appointed by Judge Frank J. Battisti as Director of the Office on School Monitoring and Community Relations on November 8, 1988. He served in that position until September 30, 1994. He is a recognized scholar in the field of school desegregation.

disclosed a school district in total fiscal and administrative collapse. A school system that was engaged in overspending its half billion dollar budget by more than $70 million annually; that had, in the three and a half years immediately preceding, amassed an indebtedness of over $140 million; that refused to account for a $40 million state advance received during its 1994–95 fiscal year; that was confronted with a $30 million shortfall to meet its daily operational expenses and salary commitments for the balance of its 1994–95 fiscal year ending on June 30, 1994; that had no credit rating; that had no credibility with the Ohio State Board of Control or the Ohio State Board of Education; that was without a local district superintendent; that was without educational, fiscal and administrative direction; that had refused, for at least three years last past to retire approximately four million square feet of excess school space in at least fourteen school buildings that were beyond economically feasible repair with annual maintenance costs exceeding $6.5 million; that was without fiscal responsibility or accountability; and, most significantly, was without an available, viable contingency plan designed to confront and correct its cascading catastrophic predicament.

In contrast, Dr. John Theodore "Ted" Sanders, the State of Ohio's Superintendent of Public Instruction,[8] a highly credible witness, presented a viable contingency plan designed to immediately restore an uninterrupted interim fiscal and operational administrative capability required to alleviate the emergency confronting the Cleveland school system.

Accordingly, on March 3, 1995, the Court issued a second judicial Order addressing the Cleveland School District's financial and administrative capabilities, supported by findings of fact and conclusions of law (Appendix A) directing the State Board of Education and its Superintendent of Public Instruction to exercise the authority vested in them by the Ohio Constitution, its duly-enacted statutes, and the Court's various desegregation remedial orders and consent decrees, and immediately implement emergency ministerial action necessary to stabilize the crisis confronting the District and develop an interim and long-range plan for the reorganization of the district's management systems and fiscal and budgetary controls.

Dr. Sanders immediately assumed personal supervision of the system by his presence in the District. He provided executive state administrative staffing. Within days, he received State Board of Control approval to seek a required $30 million emergency loan to fund daily operating and salary expenses until June 30, 1995, the end of the District's fiscal year. He successfully negotiated a loan in that amount with two financial lending institutions. Within a month, he had convinced Dr. Richard A. Boyd to take a leave of absence from his position of Executive Director of the Martha Holden Jennings Foundation, a prestigious philanthropic educational organization, to become his Deputy Superintendent of Public Instruction assigned to the day-to-day supervision of the administrative, fiscal, and educational reorganization of the Cleveland School District.[9]

8. Dr. Sanders is a nationally recognized and respected educator with impeccable credentials and career achievements. During his 80–month Washington, D.C. experience in the United States Department of Education, he served as under secretary, deputy secretary and acting secretary of education, and had a key role in planning the first Education Summit in the nation's history. He participated in creating America 2000 strategy and formulating the National Education Goals. He had served as state superintendent of education in Illinois for four years. Dr. Sanders served as president of Council of Chief State School Officers, president of the North Central Regional Education Laboratory; council member of Project 2061 of the American Association for the Advancement of Sciences; vice president of the executive committee of the National Coun-

cil for Accreditation of Teacher Education, etc. He is presently the chancellor of Southern Illinois University, a post he assumed in July of 1995.

9. Dr. Boyd, is a highly-respected educator with flawless national credentials, who had served as the superintendent of the Warren, Ohio School District before becoming the superintendent of Lakewood, Ohio's school system. He thereafter became the State Superintendent of Education for Mississippi. He remained in that position for five years before returning to the Cleveland area to assume his duties with the Martha Holden Jennings Foundation. He was the president of the Southeastern Education Improvement Laboratory, the Buckeye Association of School Ad-

Together, Doctors Sanders and Boyd, and later Dr. Goff,[10] aggressively pursued the tedious, thankless, and seemingly insurmountable emergency by interim and long-range implementation of their commitments to restore the fiscal and administrative capability of a bankrupt school system in disarray into a system with fiscal and administrative credibility, responsibility, and integrity, and a capability to support its educational mission and court-imposed desegregation responsibilities. With the Court's encouragement, they initiated dialogue with the State Auditor to conduct a performance audit of the school system, which was subsequently joined by the state legislature, to diagnose the scope and depth of the causes of the fiscal and administrative collapse of the school system.[11] With the Court's encouragement, they inaugurated an effort to rekindle and intensify corporate, business, and civic interest and participation in school district affairs.

Because the March 3, 1995 Order pledged a return of the Cleveland school system to the Cleveland School Board at an early date after it had stabilized its fiscal and administrative operational capabilities,[12] the Court's judicial action directed the State Superintendent and/or his deputy to regularly report the progress of the State's efforts, at least at monthly intervals. Since the State was reporting the progress of *MINISTERIAL* performance, the form of its reports was not material. However, the Court did, when requested, accord the state superintendents the opportunity to report the State's progress in open court.

Atkins' conjecture and protestation to the contrary, the Court had *NO ex parte* or other meetings, telephonic or other, direct or indirect communications, let alone "no fewer than 15" with the "Defendant State Superintendent of Public Instruction Ted Sanders and John Goff, and various staff members of the State Department of Education, along with the lawyers representing the State Defendants herein" concerning an "intent to impose a receivership [upon the Cleveland School District]" or any other subject between December of 1994 and the February 24, 1995 open court hearing that resulted in the March 3, 1995 decision.

Apart from professional appearances by attorneys Mark O'Neill and Margaret Ann Cannon before the presiding judge while serving as a district judge fifteen or more years previous, the Court was a total stranger to Doctors Sanders, Goff, Boyd, any staff members of the State Department of Education, or their legal counsel. Moreover, the Court was a total stranger to any of the plaintiffs, or state or local board players and/or personalities in this desegregation proceeding, before February 24, 1995. The Court was introduced to Drs. Sanders, Goff and Boyd on separate occasions *sometime after* its decision of March 3, 1995.

Contrary to Atkins' unsupported speculations that this "Presiding Judge has held an unknown number of ex parte meetings and/or telephone conferences with Ohio Governor George Voinovich ...," the "presiding judge," although an acquaintance of the now Governor of Ohio, has not seen, let alone spoken with Governor Voinovich about this case or any other subject for approximately ten or more years.

The State Auditor, James Petro, and his Assistant Auditor made a courtesy call upon the Court sometime in late July, 1995 to

---

ministrators. He has served on the Executive Committee of Chief State School Officers, the Steering Committee of the Education Priorities Committee, the Executive Committee of Southern Association of Colleges, etc.

10. Dr. John M. Goff, who was the Assistant State Superintendent of Public Instruction, succeeded Dr. Ted Sanders as State Superintendent of Public Instruction when Dr. Sanders became Chancellor of Southern Illinois University in July of 1995.

11. See paragraph 1 of footnote 1.

12. Hopefully, the Board, the District, and the entire community are prepared to recognize the existing realities of the crisis confronting the Cleveland school system and the need for immediate, decisive, and perhaps unpopular action required to eliminate all vestiges of discrimination and *expediently return the control of the schools to local authorities without supervision at the earliest practicable date, thereby making the Board accountable to the citizenry and the political elective process of the Cleveland School District.* Order of March 3, 1995, *Reed v. Rhodes,* No. 1:73 CV 1300 p. 9. (Emphasis added).

announce the state legislature's mandated performance audit, which he was about to initiate to determine the actual indebtedness of the Cleveland school system and the cause of its insolvency and mismanagement.

After exchanging expressions of cooperation, the Auditor indicated that within thirty days he would define the scope and depth of his audit and its anticipated completion date. Routine progress reports were made to the Court in late August, mid October, and early December by members of the State Auditor's staff.

As already indicated, subsequent to the March 3, 1995 Court Order, during the early days of transition between local to state control of the school system, the Court accorded Doctors Sanders, Boyd, and later Dr. Goff with or without their legal counsel, a limited number of in-chambers appearances. Initial meetings were purely perfunctory courtesy calls to introduce, on separate occasions, Dr. Boyd and later Dr. Goff, to make routine progress reports, and report anticipated ministerial problems. When accompanied by legal counsel, the discussions addressed collateral state vs. local board jurisdictional conflicts, *i.e.* who was to identify the schools to be closed and when they were to be closed; who was to determine if a school operating levy was to be presented to the electorate at the forthcoming November 3, 1995 election; who had authority to approve and execute provider product and service contracts,[13] etc.

All of the discussions were related to routine daily, ministerial decisions inherent to restoring fiscal and management integrity, responsibility, and accountability to the school system, as distinguished from discussions of any substantive legal issues anchored in the mandates of this Court's various desegregation remedial orders and consent decrees, or those joined by the local board's motion of January 5, 1995 subsequently refiled on January 3, 1996 and scheduled for a reconvened trial to begin on February 7, 1996.

The Court, recognizing that it was a stranger to the practical training, experience, and expertise required to actively engage in the complex areas of high finance and business management necessary to manage a half billion dollar enterprise, opted to encourage the state superintendent and his deputy to actively solicit assistance from the business and corporate community, which had immediate access to those costly and highly-specialized fiscal and management resources. The Court encouraged Drs. Goff and Boyd to urge the business community to conduct a search and find a business executive with demonstrated success in rehabilitating and restructuring failed, insolvent corporations or other businesses into profitable, viable operations to serve as the Cleveland School System's full-time Director of Business Operations. Such an appointment would free Dr. Boyd to devote his total attention and effort to educating the district's students and to addressing the district's attendant sociological obstacles.

Mindful of the fiscal and management resources that could be made available to the school system, the Court entertained, on perhaps six or seven occasions, corporate executive representatives of civic organizations who had expressed an interest in assisting the revitalization of the financial and management capabilities of the school system, including Robert Rawsen from the Cleveland Institute for Education.

The thrust of those discussions was always the same: An invitation from the Court to provide loaned executives and trained supporting staff specializing in various phases of fiscal and business operations, and discussion of the critical need for finding and funding a full-time director of business operations and the immediate replacement of the school system's antiquated incompatible two-platform technical support systems (computers) with state-of-the-art services necessary to develop timely information from which to formulate daily decisions and future planning. In concluding its pep talks, the Court would refer

---

13. A review of Office on School Monitoring and Community Relations (OSMCR) records disclosed that the local board of education was authorizing and executing provider and service contracts involving millions of dollars without authority and/or ratification by the State Superintendent of Instruction. Those contracts are presently under review.

conferees to Drs. Boyd and Goff for further discussions.

With the passage of time, the resolution of jurisdictional differences between state and local board members and other routine day-to-day actual or anticipated problems, evolution of direct liaison between state administrators and members of the business community and civic organizations, and requests for court dialogue became less frequent and virtually disappeared by early November, 1994.

The Court's relationship with Tom Simiele, as characterized by Atkins, is equally misconceived. Tom Simiele was a law clerk for this judge when he was appointed to the United States District Court for the Northern District of Ohio some twenty-five years ago on November 30, 1970. Simiele entered private practice after completing his clerkship. He later served as a corporate counsel for a major corporation. He left corporate service to organize the Cleveland School District's first legal department where he served until he re-entered private practice in early 1992. Currently, he has a successful office and, to the Court's knowledge, has had no interest in the administration of the school system and, more particularly, any direct or indirect legal involvement in the legal issues of *Reed v. Rhodes,* including the local board's motion of January 5, 1995, as refiled on January 3, 1996, since his departure four years ago.

The Court has, over the years, customarily met and lunched with Simiele and its other former law clerks. It intends to continue the practice. Any discussion between the Court and Simiele concerning the school system's financial and administrative dilemma was confined to a review of the legal department's ministerial protocol for retaining special legal counsel and its billing practices as he, Simiele, remembered them.

Concerned about public comments by James L. Hardiman (Hardiman) on June 5, 1995 referencing the in-chambers performance reports of Dr. Sanders and Dr. Boyd and its other meetings, the Court, on its own initiative, personally explained the purely ministerial context of the meetings and invited Hardiman to attend any or all of the meetings at his election. On June 21, 1995, the day after the Hardiman conference, the Court placed a personal three or four-minute telephone call to Atkins at his apartment in Brooklyn, New York, and explained the administrative substance of the Court discussions with Hardiman. The Court extended the same open invitation that it had conveyed to Hardiman to attend any or all of the Court meetings.[14] The sincerity and concern of counsel's rhetoric is reflected in their subsequent conduct. Neither Atkins nor Hardiman made further inquiry nor expended any effort to attend any meetings.

On a parallel, separate, and isolated track from the State efforts to restore the financial and ministerial capabilities of the Cleveland School System, the Court's Special Master was conducting hearings with all legal counsel seeking a final disposition of the LEGAL ISSUES joined by the local school district's January 5, 1995 motion seeking incremental student assignment unitary status preparatory to the trial of that issue which was scheduled to commence on May 16, 1995.

The trial was commenced as noticed, but was recessed as the result of a Joint Stipulation between the parties as hereinafter more fully discussed.

While the Special Master and the state administrators were implementing their independent assignments, the Court was occupied with preparing, resolving, and finally disposing of 110 of Judge Battisti's 194 case docket, while simultaneously commuting between Cleveland and Cincinnati to attend sessions of the Sixth Circuit Court of Appeals and executing its related Court of Appeals writing and other assignments.

One material manifestation of the State's efforts to stimulate community assistance in restoring the financial and ministerial capabilities of the school system was reflected by the announcement of the McKinsey Group, a highly respected firm of financial and management consultants, to conduct a survey designed to probe the causes for the district's

14. Memorializing the only telephonic or other court-Atkins communication is a line entry dated 5/21/95 in Plaintiffs' Application for Fees and

Costs of Thomas I. Atkins dated September 15, 1995 seeking a $170.00 payment.

plight with a view toward recommending corrective action. Local representatives of the group made two courtesy calls, maybe three, upon the Court—the first, to introduce themselves and their company; the second and/or third (if the third occurred), accompanied by Dr. Boyd or Dr. Goff, to report the progress of its undertaking. The conferences were limited to the financial and business management crisis confronting the school system, a court admonition that the school system be free from outside political interferences, and the need for immediate fiscal and business management reform. The substantive legal issues joined by the ongoing desegregation proceeding and, more particularly, the motion of January 5, 1995 and January 3, 1996, were not discussed, nor were they of interest to McKinsey personnel.

The trial of the local school board's Motion for Declaration of Partial Unitary Status for the Student Assignment Component of the Remedial Orders, and for Modification of the Consent Decree, commenced on May 16, 1995, as noticed.

It was recessed when the parties agreed to an interim temporary resolution to implement, during a period evaluation ending on December 31, 1995, a program of controlled parental choice in assigning students to individual schools. (Appendix C). Each party, including the Court *sua sponte,* reserved the right to reconvene the hearing for final disposition after December 31, 1995. The local and state defendants have exercised that election, and the trial is scheduled to reconvene on February 7, 1996, allowing the Court adequate time to consider and resolve the motion to accommodate the State's requested lead time (not later than early or mid March, 1996) to assign students as directed by the Court and to plan for related student busing to schools of assignment.

In their recusal motion, the plaintiffs argue that this Court impinged 28 U.S.C. § 455(a) by engaging in asserted *ex parte* contacts with members of the community and local and state educational representatives concerning the underlying, rapidly surfacing financial and administrative disaster that plagued the school system. Specifically, the plaintiffs allege that the decision to place the

local school district under the supervision of the State Board of Education and its Superintendent of Instruction was predicated upon non record factors and communications, including private discussions with then State Superintendent of Instruction, Ted Sanders, and others, and question the Court's impartiality to determine the contested legal issues in this case, particularly the issues joined by the pending local and state boards' joint Motion for Declaration of Partial Unitary Status for the Student Component of the Remedial Orders, and Modification of the Consent Decree noticed for hearing on February 7, 1996. The credibility of those assertions has already been discussed herein at length and requires no further attention since the Court was a stranger to all of the plaintiff, state, and local participants to this desegregation action before March 3, 1995.

Plaintiffs' recusal motion is both untimely and ill-conceived.

The recusal motion is anchored in plaintiffs' exceptions to the *JUDICIAL ACTION* exercised by the Court necessary to rehabilitate and ensure the fiscal, management, and administrative integrity and credibility of a school district in total collapse and upheaval by restoring its ministerial capability to effectively respond to its commitments and responsibilities imposed by this Court's various remedial orders and consent decrees. Plaintiffs take no exception to the Court's *JUDICIAL ACTION* addressing the contested substantive issues in the case.

■ On its merits, the plaintiffs' motion is ill-conceived. 28 U.S.C. § 455(a) states:

Any justice, judge, magistrate or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

By its language, the statute imposes an objective standard for recusal and it is appropriate only if a reasonable person, after considering all of the circumstances, would question the Court's impartiality. *Bradley v. Milliken,* 620 F.2d 1143, 1156–57 n. 5 (6th Cir.1980).

Sensitive to the dictates of 28 U.S.C. § 455 and aware of the pronouncements in

*Bradley v. Milliken* that "[t]o make out a case for recusal under § 455(a), a movant must rely on *EXTRAJUDICIAL CONDUCT RATHER THAN MATTERS ARISING IN A JUDICIAL CONTEXT* [,]" *id.* at 1157 (emphasis added); and recognizing the broad equitable power invested in district courts charged with desegregating the nation's schools by the Supreme Court's pronouncements in *Swann v. Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) ("Once a right and a violation have been shown, the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies"), the Court exercised extraordinary caution to distinguish between the *PURELY MINISTERIAL, FISCAL, AND BUSINESS MANAGEMENT* demands that surfaced in early 1995 and the singularly *LEGAL RESPONSIBILITIES OF IMPLEMENTING THE VARIOUS COURT REMEDIAL ORDERS AND CONSENT DECREES BY RESOLVING THE SUBSTANTIVE LEGAL ISSUES INCIDENT TO THAT JUDICIAL MANDATE.*

To ensure against future confusion, as already discussed, on March 3, 1995, it assigned Daniel J. McMullen to conduct hearings on the pending *SUBSTANTIVE LEGAL ISSUES* seeking judicial resolution and disposition. In a contemporaneously issued order, the Court, *BY JUDICIAL ACTION,* directed the State Board of Education through its Superintendent of Instruction to exercise its strictly administrative and ministerial authority to rehabilitate the fiscal and business integrity of the Cleveland School District and restore its capability to respond to the Court's various judicial decrees.

Obvious from the Special Master's independently-held hearings and the May 16, 1995 joint stipulation between the parties temporarily resolving the pending motion seeking student assignment incremental status, the Court did not, nor have the plaintiffs charged, any Court-conducted in-chambers meetings addressing the motion from which they were excluded.

Consequently, their allegations of a "vast, secret, and potentially adverse record on the basis of which this Court might decide the crucial pending remedial issues on student assignment" is simply an unsupported hyperbole.

■ In the instant recusal motion, plaintiffs complain not about *EXTRAJUDICIAL ACTIVITY* of the Court that would support recusal, but rather about *JUDICIAL ACTION* designed to alleviate an emergency fiscal and management crisis and stay abreast with developing state efforts to restore the Cleveland School District's ministerial capability to respond to its financial, management, and educational commitments imposed by the Court, and judicial activity calculated to promote, encourage and ensure a community climate of cooperation and assistance in achieving the fiscal and management capability which is an integral predicate to providing qualitative education within the system.[15]

Plaintiffs also argue that the *ex parte* meetings reflected the Court's "inability or unwillingness to deal with the issues in this lawsuit on [sic] a fair and impartial manner." *Plaintiffs' Motion for Recusal.* The argument fails for two reasons. The plaintiffs were on notice from the Court's March 3, 1995 Order that meetings were contemplated. Moreover, they were aware of such meetings being conducted as early as June 5, 1995, as evidenced by Hardiman's public expressions. Plaintiffs were certainly aware of

---

15. In *Bradley,* the presiding judge purportedly engaged in dialogue with community groups, experts, and representatives of the local school district in an effort "to ensure a community climate receptive to [the] Court's Orders." 620 F.2d at 1156–57.

The Sixth Circuit, reviewing the district judge's denial of plaintiff's recusal motion, supported the judge's conclusions that his conduct was within the scope of his judicial discretion:

Judge DeMascio's actions appear to us to have been judicial activities. To make out a case for recusal under § 455(a), a movant must rely on extra judicial conduct rather than matters arising in a judicial context.... Accordingly, we affirm Judge DeMascio's decision that recusal was not required. *Id.* at 1157.

the meetings after the Court extended individual personal invitations to both Atkins and Hardiman to attend any and all meetings after explaining the ministerial substances of the gatherings. During the intervening eight months, neither Atkins nor Hardiman entered formal or informal objections to the meetings or made any effort to attend any of them.

In conclusion, the Court questions the good faith of plaintiffs' counsel's motivation behind the instant motion for recusal.

As previously discussed, plaintiffs' counsel were well aware of the incidents which they assert bed-rocked their motion.

For eight months, they did nothing—they stood idly by, initiated no formal or informal action. However, within days of this Court's decision of December 29, 1995, after the Court returned Plaintiffs' Application for

Fees and Costs of Thomas I. Atkins, James L. Hardiman and David W. Whitacker for, at their option, reassessment and resubmission, observing non-compliance with Supreme Court dictates in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and after questioning, Atkins' requested "1995 usual billing rate of $340.00/hour" accrued on 30–minute increments as conflicting with the prevailing Cleveland area lode star hourly rate of $175.00/hour accrued on six-minute or tenth of an hour increments with a cap of $200.00/hour (attached as Appendix B), the instant recusal motion was filed seeking to preclude the Court from finally considering and disposing of those applications.

The timing of the motion for recusal is suspect and reflects, at the very least, a lack of sincerity and good faith.[16]

---

**16.** In early November of 1995, this Judge assessed the stewardship of Judge Battisti's docket and found that:

1. The multiple judicial vacancies that existed in the United States District Court for the Northern District of Ohio 15 months previously had been filled during 1995;
2. All judges had been assigned chambers and case dockets, and their chambers were fully-staffed and operational;
3. This Judge had reduced Judge Battisti's docket by 110 cases, leaving a balance of 84 cases for reassignment;
4. The crisis, disarray, and confusion confronting the School District on March 3, 1995 were stabilized and under control, and;
   (a). It has enjoyed a relatively efficient administrative operation since that date;
   (b). A proficiency audit mandated by the state legislature to determine the causes of the system's mismanagement that caused the emergency crisis that precipitated State control is under way;
   (c). The system has been assigned an apolitical Deputy State Superintendent of Instruction without a personal or political agenda who is dedicated to restoring its fiscal and management integrity with the capability to provide the highest level of education to students of all races permitted by state revenues and local funding;
   (d). Drs. Boyd and Goff, with the assistance of the McKinsey Group of fiscal and management consultants, have developed an interim and long-range plan designed to restore the system's fiscal and management capability which is a condition precedent to the plan's primary objective of implementing the highest qualitative level of education attainable within the district's financial revenues. The first draft of the plan, subject to

revision, styled as a Blueprint to Improve Student Performance and Achieve Financial Stability, was released for implementation in early November of 1995. It is viable and affords a logical, professional, non-political, and organized approach to solving the long-range problems of the school system. The plan restores long-needed supervised responsibility and accountability, all of which will determine the future of the Cleveland School District for the years ahead.

In light of the foregoing, in mid November of 1995, as presiding judge over the stewardship of Judge Battisti's docket, I notified the chief judge of the district court of my desire to conclude my stewardship by March 1, 1996, return its remaining 84 cases, including this desegregation case to the Clerk of Courts for reassignment so that I could resume my duties on the Sixth Circuit Court of Appeals as a judge on senior status in a more relaxed environment, with a much lighter, less physically demanding, time-consuming, and less stressful work assignment.

The March 1, 1996 date was anticipated to accommodate consideration and final disposition of any pending or unforeseeable developments in this desegregation case.

Because the parties were unable to resolve the issue of incremental student assignment unitary status, initially joined by the local school board motion of January 5, 1996, the local and state boards by joint motions, pursuant to the Joint Stipulation of May 16, 1995 (Appendix C) of January 3, 1996 seek final consideration and disposition of that issue at a trial scheduled to convene on February 7, 1996.

Accordingly, the Atkins' recusal motion seeks to preclude this Court from considering and finally disposing of his personal petition for an

Lastly, the Court notes that neither James L. Hardiman nor David W. Whitacker, plaintiffs' Cleveland co-counsel, has signed either the Motion to Recuse or the Motion to Vacate filed by Atkins.

Accordingly, because the plaintiffs' Motion for Recusal is not founded on *EXTRAJUDICIAL ACTS* of the Court but rather upon the *JUDICIAL ACTION* of the Court in the exercise of its *JUDICIAL AUTHORITY*, and for the reasons discussed herein, plaintiffs' motion is OVERRULED and DISMISSED.

IT IS SO ORDERED.

## APPENDIX A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Filed March 3, 1995

### ORDER

KRUPANSKY, Circuit Judge, Sitting by Designation

In recent weeks, the Court has monitored with increasing concern escalating controversy within the Cleveland School District (the District). The Court is particularly concerned that such controversy has affected the City of Cleveland Board of Education's (the Board) ability to administer its educational agenda and to achieve uninterrupted implementation of this Court's Remedial Desegregation Orders and the recently approved Consent Order designed to accelerate achievement of unitary status of the District and cessation of continuing judicial supervision. The culmination of this internal dissention was the resignation and departure from the city of the District School Superintendent on March 3, 1995, the date of this Order, shortly following the recent departures in January, 1995, of the District Deputy Superintendent of Educational Programs and Deputy Administrator for Support Services. Coupled with the above events, is the District's critical financial condition and its failure to secure the required support for its application to the State Board of Control for

award of attorneys' fees which was returned to him for reassessment and resubmission, at his election, by an Order of this Court dated Decem-

approval and authorization to negotiate a 29.5 million dollar emergency loan to meet its day-to-day operational costs for the remainder of the fiscal year ending June 30, 1995. The above concerns, along with additional information brought to the attention of the Court by the Office on School Monitoring and Community Relations, prompted the Court *sua sponte* to convene a hearing to determine if the Cleveland School District and its Board of Education are capable of uninterrupted implementation of the Court's Desegregation Remedial Orders and the Consent Decree entered into between the parties on 5/25/94.

A hearing was conducted on Friday, February 24, 1995 attended by all parties. From the statements of counsel, the evidence, and additional documentation from the Office on School Monitoring and Community Relations, the Court makes the following findings:

1. The District has virtually exhausted its roughly half billion dollar operating fund budgeted for the fiscal year ending June 30, 1995; and

2. The District is confronted with a projected shortfall of 29.5 million dollars for the balance of its fiscal year ending June 30, 1995;

3. The State Superintendent of Public Instruction (State Superintendent), to date, has refused to support the District's application to the State of Ohio Board of Control for authorization to seek a 29.5 million dollar loan because of the Board's refusal since October of 1994, to account for the status of approximately 40 million dollars advanced to the District by the State of Ohio during the 1994–95 fiscal year and the District's matching contribution in the same amount in compliance with the Desegregation Compliance Plan and Consent Decree dated 5/25/94, and the District's refusal to approve a Compliance Management Plan in a form acceptable to the State Superintendent;

4. The Board has not identified a lender that has agreed to advance, or is even considering advancing, a loan in the required amount of 29.5 million dollars;

ber 29, 1995 (Appendix B) and the hereinabove discussed joint motion of the state and local school boards.

5. The District's debt-to-revenue ratio is 25%—the highest in the state among comparable districts in the state:

    a. Akron     1.8%
    b. Canton     4.7%
    c. Cincinnati     7.0%
    d. Youngstown     13.1%
    e. Toledo     1.0%
    f. Columbus     0.%
    g. Dayton     0.%

6. The District concedes existing and projected escalating indebtedness in the following amounts:

    a. $128,605,000 on June 30, 1994; projected to—
    b. $144,540,000 on June 30, 1995;
    c. $147,478,000 on June 30, 1996

7. The absence of effective Fiscal and Management Controls, and other Systems Controls, has exacerbated the District's operational shortcomings and materially eroded its efforts and capability to fulfill its educational and Court ordered desegregation responsibilities;

8. The announced resignation and departure of the District Superintendent, and the recent abdication in January of 1995 of two key staff personnel, i.e., the Deputy Superintendent of Educational Programs and the Deputy Administrator of Support Services, has created a leadership and management void within the District;

9. The Coopers & Lybrand 1991–92 Budget Analysis Report commissioned by the District dated March 10, 1991, as confirmed by a District–Wide Facility Study of the Cleveland City Schools dated December 15, 1994 conducted by DeJong & Associates, Inc. and Planning Advocates, Inc., concluding that in 1991, the District had eleven million square feet of building capacity (suitable for an enrollment of 110,000 students), of which 4 million square feet was excessive in light of the District's stabilized enrollment of approximately 70,000 to 73,000 students and the recommendation of those reports that between 14 and 25 of the District's buildings should be replaced or abandoned as beyond repair, has been ignored by the Board for at least two, and more probably three, years last past. (See also this Court's Order of June 4, 1984, addressing a Board request submitted in April of 1980 requesting permission to systematically close eighteen school facilities, which request was approved in August of 1980 and later abandoned by the Board.);

10. The Board has no viable contingency plan in place to effectively address the current deteriorating Professional and Executive Staffing and Fiscal conditions that prevail within the District:

    (a). Although the Court commends the Board in seeking a dialogue with the *Business Community* with a view toward evolving long-range management of fiscal and system controls in the District and encourages the District's effort to involve the *Business Community* in meaningful oversight responsibility, the corrective measures proposed by the District lack definition and will not alleviate the immediate crises confronting the District;

11. The State Superintendent has acknowledged the responsibility and authority invested in his office by the Ohio Constitution and its duly enacted statutes, the Court's Desegregation Remedial Orders, the Consent Decree and this Court's Orders dated 5/16/79 and 5/13/86, and has advised the Court of his office's ability to immediately implement emergency action necessary to stabilize the crises confronting the District and present, for Court approval, a finalized interim and long-range plan for the reorganization of the

District's Management Systems and Fiscal and Budgetary Controls;

12. The Court assigns credibility to the State Superintendent's professional and administrative credentials, his experience and commitment to exercise the responsibility delegated to his office, including his continued implementation of Vision 21;

13. The District is confronted with a financial crisis of magnitude and is without an experienced executive staff necessary for an uninterrupted and effective implementation of its Desegregation Remedial Orders of this Court and the Consent Decree of 5/25/94; and

14. Any interruption or delay in the timely execution of the District's executive responsibilities will be detrimental to and materially jeopardize the status of and the effective continuing implementation of the Court's Desegregation Remedial Orders and the Consent Decree of 5/25/94.

The Court concludes, as a matter of law, that the ultimate supervision of the District has been delegated to the State Superintendent, acting on behalf of the State of Ohio Board of Education, pursuant to authority vested in that office by the Ohio Constitution, its duly enacted statutes, the 2/6/78 Remedial Order of this Court, the 5/25/94 Consent Decree incorporated therein, this Court's final orders dated 5/16/79 and 5/13/86 and this Order.

Accordingly:

1. The State Superintendent is directed to assume immediate supervision and operational, fiscal and personnel management of the District, including, but not limited to, administration of its educational policies and all other powers incident thereto during the state of crisis confronting the said District and until further order of this Court.

2. The State Superintendent shall forthwith expedite approval of the State Board of Control to negotiate a loan in the amount of 29.5 million dollars in the name of the Cleveland School District to provide necessary funding for the operation of the District for the remainder of the fiscal year ending June 30, 1995, and will lend the support of his office to negotiate such a loan with available interested lenders.

3. The State Superintendent shall immediately initiate and implement action to designate and appoint Professional and Executive Staffing under his immediate direction and control necessary to the uninterrupted implementation of this Court's various Desegregation and Remedial Orders, including this Order and the Consent Decree of 5/25/94.

4. The State Superintendent shall finalize the development and implement, subject to Court approval, an interim and long-range plan of reorganization of the District's Professional and Executive Staffing, its Management and Control Systems, its Budgetary and Fiscal Controls, and all things incidental to stabilizing the fiscal and operational performance of the District during its period of crisis.

5. The State Superintendent shall, on a regular monthly basis, report to the Court the progress and status of the reorganization of the Professional and Executive Staffing of the District and its Systems Budgetary and Fiscal Controls.

6. The Board, the District, and their Professional, Executive and other personnel shall support the actions directed by the State Superintendent without direct or indirect interference with his implementation of this Court's Order.

7. The Board shall, by not later than May 1 of 1995, identify at least 14 school buildings that should be closed as beyond repair and recommend to the State Superintendent a schedule of closing dates.

8. The Board, in consultation with the State Superintendent, shall continue to consider and determine the timing for resubmission of a school operating levy to the electorate.

The Court is unaware of any State laws which this Order contradicts. To the extent any State law provision shall impede the implementation of this Order, such law is held to be inapplicable. This Order is necessary to remedy rights under the Fourteenth Amendment under the United States Consti-

tution and necessarily takes precedence over any contrary State or local laws or provisions. *See, e.g., Brown v. Board of Education,* 349 U.S. 294 [75 S.Ct. 753, 99 L.Ed. 1083] (1955) (*Brown II*); *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1 [91 S.Ct. 1267, 28 L.Ed.2d 554] (1971); *Jenkins v. Missouri,* 639 F.Supp. 19, 43–46 (W.D.Mo.1985), *aff'd* 807 F.2d 657 (8th Cir. 1986), *cert. denied,* 484 U.S. 816 [108 S.Ct. 70, 98 L.Ed.2d 34] (1987).

Hopefully, the Board, the District and the entire community is prepared to recognize the existing realities of the crisis confronting the Cleveland school system and the need for immediate, decisive, and perhaps unpopular action required to eliminate all vestiges of desegregation and expediently return the control of the schools to local authorities without judicial supervision at the earliest practicable date, thereby making the Board accountable to the citizenry and the political elective process of the Cleveland School District.

IT IS SO ORDERED.

### APPENDIX B

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Filed Dec. 28, 1995

*ORDER*

KRUPANSKY, Circuit Judge, Sitting by Designation.

Pursuant to 42 U.S.C. § 1988, the Court is charged with the authority and responsibility of reviewing and, within its discretion, awarding reasonable attorneys fees to the prevailing party "in any action or proceeding to enforce a provision of §§ 1981, 1981a, 1982, [or] 1983 . . . ."

Before the Court is the application of plaintiffs' counsel Thomas I. Atkins of New York, New York, for legal services performed between the dates of 7/6/94—8/4/95 at a rate of $340.00/hour for a total of $126,-401.04, plus out-of-pocket costs and a fee submission for the consultation services of a Dr. Robert L. Green at $75.00/hour for an additional $36,057.50, for an aggregate of $162,458.54; the application of James L. Hardiman of Cleveland, Ohio for legal services performed between 3/2/92 through 12/28/92 at $175.75/hour for a total of $20,256.25, 1/7/93 through 12/22/93 at $175/hour for a total of $73,587.50, 1/6/94 through 12/30/94 at $200/hour for a total of $119,550.00, 1/3/95 through 8/31/95 at $225/hour for a total of $50,006.25 with out-of-pocket expenses of $386, for an aggregate of $263,786.00; and the application of David W. Whitaker of Beachwood, Ohio from 5/no date/90 through 11/21/92 (no supporting documentation for that period of time reflecting an hourly rate or number of hours committed), 11/22/92 through 12/28/92 at a rate of $160/hour with no total amount listed, for the period between 1/7/93 and 12/22/93 at $160/hour with no total amount listed, for the period between 1/14/94 and 12/27/94 at $160/hour with no total amount listed, for the period 1/8/95 and 9/1/95 at $160/hour with no total amount listed, for a total of $102,307.99, plus out-of-pocket expenses of $427.00, for an aggregate of $102,734.99, or a grand total for all plaintiffs' counsel of $528,979.53.

Subsequent to the above fee submissions, plaintiffs' counsel jointly filed a pleading styled a Motion for an Interim Award of Fees and Costs, with supporting briefs. The motion seeks an interim payment of fees and costs to Thomas I. Atkins in the amount of $63,200.52, plus $18,028.75 to Dr. Robert L. Green, his consultant, for a total of $81,-229.27; to James L. Hardiman in the amount of $131,893.00; and to David W. Whitaker in the amount of $51,153.95.

At the outset, the Court, aware of existing legal precedent, recognizes its discretionary authority to award *reasonable* interim attorneys fees to a *prevailing party* in a 42 U.S.C. § 1983 action arising from infringements of protected constitutional rights.

The burden placed upon the Court by 42 U.S.C. § 1988 is a heavy one, particularly within the context of the instant case. In exercising its discretion in this highly controversial area, the Court must be ever mindful of fundamental principles that ensure fair, impartial, and equitable treatment of all interested parties, including their legal counsel.

Initially, it should be noted that the Court subscribes to and endorses the concept that the plaintiffs and all defendants, the State of Ohio Board of Education, the City of Cleveland School District, and the Cleveland Board of Education should be free to retain the most qualified available legal talent of their own choice without interference by the Court. The Court also subscribes to and endorses the universally adopted admonition of the Supreme Court and the circuit courts that have addressed the issue of awarding legal fees in a desegregation case that defines reasonable attorneys fees as "fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys." *Hensley v. Eckerhart*, 461 U.S. 424, 431 n. 4, 103 S.Ct. 1933, 1938 n. 4 [76 L.Ed.2d 40] (1983). More specifically,

[t]o put these guidelines [the 12 *Johnson* factors] into perspective and as a caveat to their application, courts must remember that they do not have a mandate under Section 706(k) [of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k) ] to make the prevailing counsel rich.. Concomitantly, the Section should not be implemented in a manner to make the *private attorney general's position so lucrative as to ridicule the public attorney general.* The statute was not passed for the benefit of attorneys but to enable litigants to obtain competent counsel worthy of a contest with the caliber of counsel available to their opposition and to fairly place the economical [sic] burden of Title VII litigation. Adequate compensation is necessary, however, to enable an attorney to serve his client effectively and to preserve the integrity and independence of the profession. The guidelines contained herein are merely an attempt to assist in this balancing process.[1]

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 719–20 (5th Cir.1974); *see also Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal.1974); *aff'd,* 950 [550] F.2d 464 (1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970 [56 L.Ed.2d 525] (1978); *Swann v. Charlotte–Mecklenburg Board of Education,* 66 F.R.D. 483 (W.D.N.C.1975).

*Hensley,* 461 U.S. at 429, 103 S.Ct. at 1937, also dictates that "[t]he amount of the fee, of course, must be determined on the facts of each case." This statement does not lighten the Court's burden in the case at bar but rather poses a material obstacle in pursuing a resolution because, on March 3, 1995, when the Cleveland School District was placed under the supervision of the Ohio Board of Education and its Superintendent of Instruction by this Court (a copy of its Order is attached for convenience as Appendix A), it was and continues to be hopelessly *bankrupt.* It had exhausted its half billion dollar annual budget, was confronting a shortfall of $30,-000,000, and was in need of an immediate loan in that amount, which it was unable to negotiate. It required the funds to meet daily operating expenses and payroll until June 30, 1995 (the end of its fiscal year) because it had, during the 3½ short years immediately preceding the March 3, 1995 court order, escalated its indebtedness from $35 million to a staggering and irreversible $140 or more million as a direct result of politicized mismanagement.[2]

---

1. In the instant proceeding, Special Counsel, of equal competence and longevity, appointed by the State of Ohio Attorney General to represent the defendant State of Ohio Board of Education and its Superintendent of Instruction, is compensated at a rate of $95.00 per hour accrued in tenth of an hour (or six-minute) increments, as compared to a $340.00 per hour rate accrued in half-hour (30–minute) increments, as proposed by plaintiffs' New York counsel, and $160.00 to $200.00 per hour accrued in 15–minute increments, as proposed by local counsel.

2. During the same time frame (1993–94); the student daily absentee rate in grades 9 through 12 increased to 29% (from Cleveland Public

Schools Report: "Attendance Rates 1989–90 through 1993–94"); the cohort student dropout rate in grades 10 through 12 rose to 35% (from District Periodic Status Report (PSR) Specification 2b); the 9th to 10th grade non-promotion rate was 42% of the total enrollment of those grades, which rate rose to 61% by the end of the 1994–95 school year in June of 1995 (from Cleveland City School District 2A–Promotes/Nonpromotes Annual Report(s) for Academic Year(s) 1993–94 and 1994–95); the 10th to 11th grade non-promotion rate was approximately 32%, which rose to 38% by the end of the 1994–95 school year in June, 1995 (*Id.*); the 11th to 12th grade non-promotion rate was approximately

Although the fiscal condition of the District does not directly impact counsel's right to an award of reasonable attorneys fees, and this Court excludes that consideration in arriving at a reasonable fee allowance, it recognizes, however, that every dollar of an excessive fee award is a dollar diverted from the education of the District's student enrollment and from the Court's ability to efficiently and effectively implement its various remedial orders. Thus, in the instant case, the fiscal condition of the District is material only to emphasize the necessity for a more scrutinizing review of legal fee submissions.

The Court has read with interest the briefs of plaintiffs' counsel in support of their joint petition for interim fee awards which imply that *Northcross v. Board of Education of Memphis,* 611 F.2d 624, 641 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999 [64 L.Ed.2d 862] (1980) is in conflict with, and overrides, at least in this circuit, the *"Johnson* factors" enunciated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). Counsel misinterpret the pronouncements of those cases. Contrary to counsel's implications, the twelve *"Johnson* factors"[3] are consistent with those recommended by the American Bar Association's Code of Professional Responsibility, Ethical Consideration 2–18, Disciplinary Rule 2–106. They are not inflexible elements to be rigidly applied in deriving a reasonable fee award. They are exactly what they purport to be, namely, *guidelines* to be considered along with all other factors that have evolved in common law and the exercise of experience and sound judgment. The Sixth Circuit's rationale in *Northcross* merely amplified the application of the *Johnson* guidelines without

conflict. However, assuming *arguendo,* the existence of conflict between the dispositions, the Supreme Court adopted the "12 *Johnson* factors" in *Hensley,* in 1983, five years after the Sixth Circuit 1979 decision in *Northcross.* The pronouncements of *Hensley* and its progeny, accordingly, became and remain the prevailing precedent addressing the issue of § 1988 fee awards.

The responsibility of the trial court in awarding fees in cases of this kind is a thankless one because it is necessarily called upon to question the time, expertise, and professional work effort of lawyers appearing before it, which is difficult and distasteful. In all probability, its decision will be totally unsatisfactory to all concerned.

The trial judge's burden to conserve and protect the School District's revenues has, at least to some degree, been lightened by the findings, conclusions, and mandates of the Supreme Court expressed with clarity and precision by Justice Stevens in *Hensley.* This Court accepts the direction of *Hensley,* 461 U.S. at 433–34, 103 S.Ct. at 1939–40 that counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client *within the venue of the litigation,* for all time *reasonably* expended on a matter. As nearly as possible, *market standards within the community of the action should prevail,* for that is the best way of ensuring that competent counsel will be available to all persons with bona fide civil rights claims. In *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d at 718, the Fifth Circuit stated:

The customary fee for *similar work in the community* should be considered. It is open knowledge that various types of legal work

---

26%, which non-promotion rate rose to 31% by the end of the following school year in 1995 (*Id.*); and demonstrated student proficiency (predicated upon the results of the March, 1995 4th grade proficiency test) of Ohio large urban school districts reached the lowest level in the state (from Cleveland Public Schools Report: "Fourth Grade Proficiency Test Results", 6/28/95).

**3.** The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of

the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717–19. These factors derive directly from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2–106.

command differing scales of compensation.... (Emphasis added).[4]

Present legal precedent recognizes that a prevailing applicant seeking *fees bears the burden of proving entitlement to an award* by contemporaneously documented records of the hours expended and the hourly rate applied. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. Although a fee submission is not required to record in great detail how each minute of time was expended in order to carry the assigned burden of proof, an applicant should maintain accurate contemporaneous time records in a manner that will enable a reviewing court to identify *distinct claims,* identify issues addressed, justify the participation of multiple counsel, and distinguish between redundant, unnecessary, and duplicated work effort and proper utilization of time.[5] An applicant's failure to keep records identifying distinct claims in sufficient detail from which a neutral judge can make a fair evaluation of time expended, the nature and need for the service, and the reasonable fee to be allowed may materially jeopardize the amount of the award.

This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94–1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority."

*Hensley,* 461 U.S. at 433–34, 103 S.Ct. at 1939–40 (*citing Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (*en banc*) (emphasis the *Copeland* court's)).

The Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974) noted that:

Although hours claimed or spent on a case should not be the sole basis for determining a fee [citation], they are a necessary ingredient to be considered. The trial judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to com-

4. Prevailing current market standards within the greater Cleveland community for similar services is reflected by a broad spectrum of actual hourly rates charged by various Special Counsel in the instant proceeding to address common issues arising in ongoing controversy:

    1.  Special Counsel for the State of Ohio Board of Education and its Superintendent of Instruction is paid a rate of $95.00 per hour by the State of Ohio Attorney General;

    2.  Special Counsel for the Cleveland Board of Education charge the following rates:

        a).  Squire, Sanders & Dempsey        $187.00 per hour

        b).  Hogan & Hartson        $165.00 per hour

        c).  Teamor, Thompson & Associates        $145.00 per hour.

Accordingly, without justification to the contrary, and with reference to the actual legal fees charged by qualified lawyers and recognized legal firms within the greater Cleveland area to address the common issues of this case, the Court determines the lode star prevailing fair and reasonable rate for legal services performed to address the issues and controversies common to this desegregation action in this community to be $175.00 per hour, but no greater than $200.00 per hour, to be accrued in tenth of an hour (or six-minute) increments.

5. Commenting on an applicant's failure to carry his assigned burden of proof, the Supreme Court stated:

"we would not view with sympathy any claim that a district court *abused its discretion in awarding unreasonably low attorneys fees* in a suit in which plaintiffs were only partially successful if *counsel's records* do not prove a proper basis for determining how much time was spent on particular claims. *See Hensley* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12 (citation omitted) (emphasis added).

plete similar activities. *If more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do, may obviously be discounted. It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such non-legal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it.* (Emphasis added).

Commenting on other American Bar Association guidelines, the Fifth Circuit observed that:

The trial judge should closely observe the attorney's work product, his preparation, and general ability before the court. The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration.

*Johnson*, 488 F.2d at 718.

Assessing the novelty and difficulty of issues involved, the *Johnson* court recognized that:

Cases of first impression generally require more time and effort on the attorney's part. Although this greater expenditure of time in research and preparation is an investment by counsel in obtaining knowledge which can be used in similar later cases, he should not be penalized for undertaking a case which may "make new law."

*Id.*

With the exception of the most recent landmark disposition in *Jenkins v. Missouri* [*Missouri v. Jenkins*], —— U.S. ——, 115 S.Ct. 2038 [132 L.Ed.2d 63] (1995), the evolution of desegregation law from *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) to the present, reflects that most, if not all, of the issues of first impression which initially attached to those cases were decided by various circuits throughout the nation and by Supreme Court dispositions a number of years ago. Remaining cases in controversy are indigenous to local community school districts and require the attention, legal perception and understanding of local counsel who are members of the community and who are sensitive to the voice of the community from first hand personal observations.

Apart from providing a historical background of a proceeding, in today's world of computers the legal expertise previously associated with longevity in any given desegregation action is virtually instantaneously available to counsel by activating an appropriate computer key and accessing either Lexis or Westlaw for the evolution of legal precedent addressing any issue in controversy.

It is true that plaintiffs, in the instant action, were initially successful in their efforts which resulted in the late Judge Battisti's February 6, 1978 remedial order. Although this Court was not privy to his subsequent remedial orders, it assumes that plaintiffs were equally successful in "substantially advancing their clients' interests" by obtaining "significant concession[s] from the defendants" as a result of prosecuting the merits of each of those successive actions on their individual merits. *Hensley*, 461 U.S. at 430–31, 103 S.Ct. at 1938. Nor does the Court question the success of the applicants in influencing, at least to some degree, the consent order dated May 16, 1995, which it approved. However, past successes, for which counsel have been paid, do not necessarily embrace all successive future issues that may arise during the implementation of a remedial order entered twenty three or more years ago.

In seeking fee awards payable from a common taxpayers' desegregation fund (Desegregation Fund # 12), as in the instant ongoing legal proceeding, plaintiffs' and defendants' counsel alike have a responsibility to exercise "billing judgment" in drafting fee submissions arising from successive interpretations and/or implementations of the seminal remedial order and its progeny within the "prevailing party" concept. Because there is no precise rule or formula for making these

determinations, the product of hours reasonably expended in pursuing successive ventures, the reasonable hourly rate to be applied, the justification for multiple attorney participation, and the degree of success, if any, achieved are elusive factors in evaluating the reasonable worth to be assigned to those efforts.

It would appear from *Hensley* that, to qualify as a "prevailing party" seeking relief arising from successive interpretations and implementations of the seminal remedial order, subsequent successive action undertaken by applicants must address a "substantial" claim which, through the efforts of the applicants, has advanced their clients' interests by obtaining *significant concessions* from the defendant.

For example, in the instant case, the Court expresses great concern as to the need and justification for *multiple counsel* and/or *multiple firms* to monitor compliance with court remedial orders, the time and duplication of effort expended, and the hourly rate applied to those ongoing monitoring services.

In considering the impact of the "prevailing party" doctrine, the Court and counsel should be mindful of the Supreme Court's findings in *Hensley* that:

> If ... a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. *Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill.* Again, the most critical factor is the degree of success obtained.
>
> Application of this principle is particularly important in complex civil rights litigation involving numerous challenges to institutional practices or conditions. This type of litigation is lengthy and demands many hours of lawyers' services. Although the plaintiff often may succeed in identifying some unlawful practices or conditions, the range of possible success is vast. That the plaintiff is a "prevailing party" therefore may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved. In this case, for example, the District Court's award of fees based on 2,557 hours worked may have been reasonable in light of the substantial relief obtained. But had respondents prevailed on only one of their six general claims, for example the claim that petitioners' visitation, mail, and telephone policies were overly restrictive, see n. 1, *supra,* a fee award based on the claimed hours clearly would have been excessive.
>
> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.

*Id.* 461 U.S. at 436, 103 S.Ct. at 1941 (emphasis added).

In *Kelley v. Metropolitan County Bd. of Education,* 773 F.2d 677 (6th Cir.1985), *cert. denied,* 474 U.S. 1083, 106 S.Ct. 853 [88 L.Ed.2d 893] (1986) an *en banc* panel of the Sixth Circuit applied *Hensley* in a context similar to this case. In *Kelley,* the lower court awarded attorneys fees to plaintiffs "for time spent [on] unsuccessful charges of contempt against the Board, yet unresolved matters as to faculty composition, and their efforts to keep Pearl High School open." *Id.* at 685 n. 7. In reviewing the propriety of these awards, the *Kelley* panel remanded the case to the lower court to "follow the mandate of *Hensley* to determine which claims plaintiffs have succeeded upon and those which they have not, and to calculate the attorneys' compensable hours accordingly[.]" *Id.* at 686. After *Hensley,* the *Kelley* panel directed, "a party's request for attorney's fees [should] be carefully scrutinized as to the extent of success on each claim, and further, that time spent on unsuccessful

claims that are distinct from successful claims should be excluded in determining a reasonable fee." *Id.* at 685.

This review of the "*Johnson* factors," together with the Supreme Court's dictates in *Hensley* and the Sixth Circuit's pronouncements in *Kelley*, merely serve to highlight the importance of incorporating contemporaneously recorded evidence supporting a fee application from which a court may glean meaningful information to exercise an informed judgment in arriving at an equitable fee award.

Additionally, because the fees paid to multiple law firms representing the defendant School District were and are payable from a common public fund (Desegregation Fund # 12)[6] with those paid to plaintiffs' counsel, and because any excessive award of funds to the School District's counsel likewise diverts funds more properly used to educate the students in the District and impairs this Court's implementation of the remedial orders, the guidelines of this Order apply with equal force to the fee applications of counsel for the District.[7] Accordingly, at least at this juncture, the fee applications of the District's counsel will be monitored by the Office on School Monitoring and Community Relations for compliance with the dictates of this Order and the mandates of the Supreme Court in *Hensley.*

Because the fees paid to all counsel in this case flow from taxpayer funds, the *amount* of fee awards should be a matter of public record. Also, the fee applications themselves will be presumed to be a public record, unless a party invoking the "work product" or "privileged communication" doctrines has justified the assertion.

Unfortunately, the Court is unable to evaluate the merits of the instant fee applications of plaintiffs' counsel since they do not incorporate sufficient necessary detail to permit an assessment within the guidelines of *Johnson* and the dictates of *Hensley* because those applications, some of which are inexcusably untimely and which seek fees for services rendered in 1990, fail to reflect information from which the Court can identify the issues addressed, justify participation of multiple counsel, distinguish between redundant, unnecessary and/or duplicated work effort and proper utilization of time, and/or whether time charged was essential to the litigation.

For the above reasons, in the interests of fairness to applicants and their retained consultants, these parties shall be afforded an opportunity to revisit their fee applications with the following observations in mind:

---

6. Special Counsel appointed by the State of Ohio Attorney General to represent the State of Ohio Board of Education and its Superintendent of Instruction are paid from State funds and not from the City of Cleveland School District's revenues. Consequently, these payments do not reduce funding more appropriately allocated to student educational efforts.

7. A cursory review of payments authorized by Cleveland Board of Education resolutions to its legal counsel and paid from Desegregation Fund # 12 during the fiscal year 1994 and between the period of 2/23/95 and 6/23/95 reflect what appears to be a total disregard for the Supreme Court's admonitions and dictates expressed in *Hensley.*

For example, during the fiscal year 1993–94, the Cleveland Board of Education paid, without objection, fee schedules submitted by Squire, Sanders & Dempsey in the amount of $376,-156.81, Hogan & Hartson of Washington, D.C.—$280,580.46, and Teamor, Thompson & Associates—$258,522.89, for a total of $915,260.60 (from the Office on School Monitoring and Com-

munity Relations calculation based on Cleveland Board of Education Resolutions passed during fiscal year 1993–94). The above payments were approximately three times greater, or approximately 300%, than the fees paid to plaintiffs' legal counsel or the fees paid to the State Board of Education's legal counsel for addressing the same issues and controversies arising during the same time period.

It also appears that $243,888.35 of $297,-681.70 paid to Squire, Sanders & Dempsey for the period between 2/3/95 and 6/23/95, and $127,672.59 of a $198,730.11 fee paid to Teamor, Thompson & Associates for the same period, were paid without review or resort to determining compliance with the Supreme Court's mandates in *Hensley.* Moreover, the payments were authorized by invalid Board resolution enacted after this Court's Order of March 3, 1995, and must, accordingly, be reassessed and approved by the State Board of Education for compliance with *Hensley* and this Order.

1.  Recognizing a legitimate concern for the protection of the attorney-client privilege, the Court nonetheless believes that many, if not most, of the daily entries presented lack sufficient detail in their description of legal services to permit it to fairly evaluate the measure of time devoted to identifiable issues addressed and the work performed. The applications are replete with non informative, meaningless entries listing telephone calls to and/or meetings with co-counsel and/or other individuals without reference to and/or meaningful explanation of the purpose of the call or meeting, its relevance or materiality, the issues discussed or other pertinent necessary information from which the Court can formulate a considered evaluation as directed by *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941. The same comments apply with respect to time charges prepared by experts employed to assist counsel.

2.  The Court does not believe that it is the usual and customary billing practice in the legal community where this lawsuit is venued to charge for time in half or quarter hour increments, as reflected in these fee applications. For example, a two, three or five-minute telephone conversation between plaintiffs' New York counsel, who conducts his legal practice primarily, if not exclusively, by telephone from his apartment in New York City, and who seeks an hourly rate of $340.00 calculated in half hour increments, and one of his two co-counsel in Cleveland, Ohio, who seeks an hourly rate of $200.00 calculated in quarter hour increments, results in a charge to the School District of $220.00. If the same telephone call includes a second Cleveland co-counsel, who seeks an hourly rate of $160.00, also calculated in quarter-hour increments, that two or three-minute telephone call is escalated to a charge of $260.00. That same three or four-minute telephone call calculated in six-minute increments or tenths of an hour, which is the general practice in the Cleveland legal community, would cost $70.00. As demonstrated, the incremental predicate upon which telephone charges are accrued rises to a high level of significance in the instant action because of the great volume of intra-telephonic communications between plaintiffs' co-counsel and the inter-telephonic communications between plaintiffs' counsel, individually and/or collectively, and other parties to this case, all of which are difficult to correlate and which emphasize the importance of maintaining contemporaneous records to support fee submissions. In the Court's experience, clients rightfully demand the reporting of time charges in six (6) minute increments, *i.e.* tenths of an hour. The same comments apply with respect to time charges prepared by experts employed to assist counsel.

3.  The interaction between incremental charges, hourly rates, and duplication of effort amongst an inordinate number of multiple intra-firm and/or inter-firm counsel representing the same plaintiff or defendant, as the case may be, exacerbates the precipitous mathematical progression which attaches to deriving a reasonable fee award for addressing a given controversy amplifies the Court's concern. The interaction of these elements, if not properly scrutinized, lends itself to inter-counsel and intra-firm networking, which could result in pyramiding fees. For example, if, on the same day, one law firm assigns two lawyers to consider an issue, each with a hypothetical hourly rate of $175.00, and they confer, the hourly rate becomes $350.00. If they, in turn, discuss the controversy with a member of the second firm with a hypothetical hourly rate of $160.00, the hourly rate increases to $510.00. If a second member of the second firm with the same hypothetical hourly rate enters the dialogue, the hourly rate is $670.00. If a member of the third firm with a hypothetical hourly rate of $145.00 is consulted, the combined hourly rate is escalated to $815.00, as

compared to a $175.00 hourly charge if a single lawyer would have resolved the issue. Depending upon the hourly incremental billing practice, *i.e.* tenths of an hour or $81.50 on the high side as compared to $17.50 on the low side or $203.75 as compared to $43.75 predicated on a quarterly incremental hourly charge. Accordingly, the burden rests upon the multiple applicants to discount any semblance of the above alluded to interaction.

4. Although the Court recognizes the propriety of petitioning for compensation for time devoted to the preparation of fee applications under 42 U.S.C. § 1988, it does not believe standard billing practices to include compensation to attorneys for time devoted to the preparation and posting of time charges and the preparation of client invoices.

5. The Court also notes what appears to be some inconsistency in the daily time charges recorded by the attorneys. In some instances, for example, it observes different times posted for the same work performed by the respective attorneys who were apparently working together on the same matter on the same date. In other instances, the Court noticed that, while one attorney posted a time entry, others posted no time entry, even though the posted entry suggested that the attorneys were working together on the same matter on the same date.

6. In order to properly evaluate out-of-pocket expenses incurred by counsel, it is necessary not only to provide a detailed explanation of individual expenses, but to also furnish to the Court copies of invoices and receipts for each such expense. The same comments apply with respect to out-of-pocket expenses incurred by experts employed to assist counsel.

7. The Court is also concerned about the appropriateness of charging for meals.

8. The Court is also concerned about the need for multiple lawyers to address identical issues and the magnitude of the hourly rates employed by the respective attorneys, and questions whether they properly reflect the usual and customary rates employed in the greater Cleveland metropolitan area legal community where this lawsuit is venued. Likewise, it expresses some concern over the measure of the escalation of hourly rates from one year to the next, and whether those increases are consistent with the usual and customary escalation of rates employed in this legal community.

9. Finally, from the perspective of both the School District and the billing attorney, the Court does not believe that it is an accepted practice within the local community to accumulate unbilled fees and costs over extensive periods before fee bills are submitted. Charges dating back more than one year or, as in one instance here, in excess of 3½ years, are difficult, if not impossible, to evaluate without retrieving the required Court and School District's records, if they are available, and correlating the application with contemporaneously filed applications. Untimely filing also can severely impact the finances and significantly disrupt the budgetary planning of the District. Accordingly, in the future, all fee applications shall be submitted biannually.

From the foregoing observations, the Court concludes that, absent justification to the contrary, "the fee applicant bears the burden of establishing an entitlement to an award[.]" *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941 [76 L.Ed.2d 40] (1983) and proving that:

1. The applicant has pursued a substantial claim on behalf of his client which has advanced the client's interests by obtaining significant concessions from the defendant, thereby satisfying the prevailing party doctrine defined by *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933 [76 L.Ed.2d 40] (1983).

2. The participation of multiple counsel or multiple firms is justified and has not

resulted in a duplication of time and effort, and that the hours expended were not excessive, redundant, or otherwise unnecessary. *Hensley,* 461 U.S. at 433–34, 103 S.Ct. at 1939–40; *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974).

3. The proposed hourly rate distinguishes between court appearances, non-court or other legal work, investigation, monitoring, clerical work, compilation of facts and statistics, and other work which can be accomplished by non-lawyers, which may command a lesser rate and which is not enhanced because it is accomplished by a lawyer. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40 & n. 9; *Johnson,* 488 F.2d at 717.

4. The proposed hourly rate is the prevailing reasonable hourly rate within the Cleveland metropolitan legal community for similar services addressing similar issues and/or controversies, recognizing that various types of legal services command differing scales of compensation. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940 & n. 9; *Johnson,* 488 F.2d at 718–19.

5. The proposed billable hours are not excessive. *Hensley,* 461 U.S. [at] 434, 103 S.Ct. at 1939–40; *Johnson,* 488 F.2d at 717.

Accordingly, without justification to the contrary, the Court determines that from a review of the actual legal fees charged by qualified lawyers and recognized legal firms within the greater Cleveland area to address the common issues of this case, the lode star prevailing fair and reasonable rate for legal services performed to address the issues and controversies common to this desegregation action in this community to be $175.00 per hour with a maximum outside limitation of $200.00 per hour to be accrued in tenths of an hour or six-minute increments.

In the future, expert consultants, paid from public funds shall be retained upon application to and approval by the Court.

For the reasons aforestated, the fee applications are returned to counsel for reconsideration and resubmission by not later than January 30, 1996.

The Court also approves the following interim fees:

| | |
|---|---|
| Thomas I. Atkins | $42,133.68 |
| Robert L. Green | $12,019.17 |
| James L. Hardiman | $87,926.47 |
| David W. Whitacker | $33,388.86 |

IT IS SO ORDERED.

### APPENDIX C

### IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

Civil Action No. C73–1300

Robert Anthony Reed, *et al.,* Plaintiffs,

v.

James A. Rhodes, *et al.,* Defendants.

**JOINT STIPULATION**

JUDGE ROBERT B. KRUPANSKY

1. The District's motion for declaration for partial unitary status as to student assignments is withdrawn without prejudice to any of its rights, including the right to refile a similar motion at a future date.

2. The parties agree that student assignments may be made for the 1995–96 school year in accordance with the State plan proposed to the Court, a copy of which is attached as Exhibit A.

3. No party will challenge the State's assignment plan as a violation of the Consent Decree.

4. Neither the implementation of the State's plan nor any incremental increase in the number of racially identifiable schools (meaning schools exceeding the ±15 percentage point parameters) occurring in the 1995–96 school year shall be deemed or treated as a Consent Decree violation or as evidence of lack of substantial compliance with the extant remedial orders or the Consent Decree.

5. The State and the District shall make every reasonable effort to implement the ed-

ucational components of the Consent Decree in accordance with the schedule provided therein.

6. Not later than November 13, 1995, the Superintendent, after consultation with the parties, shall submit a report to the Court evaluating the results of pupil assignments for the 1995–1996 school year.

7. Not later than December 31, 1995 the parties shall present to the Court an agreement concerning pupil assignments which shall last for the term of the Consent Decree.

8. If the parties fail to reach agreement by December 31, 1995, any party may move the Court on or before January 31, 1996, or the Court may convene hearings *sua sponte,* to consider pupil assignments for the school year 1996–1997 and thereafter.

9. The Superintendent shall have discretion to implement the provisions of the student-assignment plan.

10. Upon approval by the Court, this Joint Stipulation shall be deemed a modification of the Consent Decree for the school year 1995–1996.

Executed at Cleveland, Ohio this 16th day of May, 1995 by the undersigned attorneys of record for the parties.

**THE PLAINTIFF CLASS, BY ITS COUNSEL OF RECORD**

/s/ Thomas I. Atkins

Thomas I. Atkins
Brooklyn, NY

/s/ James L. Hardiman

James L. Hardiman
Cleveland, OH

/s/ David W. Whitaker

David W. Whitaker
Beachwood, OH

**THE BOARD OF EDUCATION OF THE CLEVELAND CITY SCHOOL DISTRICT and THE SUPERINTENDENT OF SCHOOLS**

**APPROVED BY COUNSEL:**

/s/ Wanda Rembert Arnold

Wanda Rembert Arnold

General Counsel

Cleveland Board of Education

Cleveland, OH

/s/ Frederick R. Nance

Frederick R. Nance

Dennis G. Terez

Squire, Sanders & Dempsey

Cleveland, OH

/s/ Adrian D. Thompson

Adrian D. Thompson

Cleveland, OH

**THE OHIO STATE BOARD OF EDUCATION and THE SUPERINTENDENT OF PUBLIC INSTRUCTION**

**APPROVED BY COUNSEL:**

BETTY MONTGOMERY

ATTORNEY GENERAL OF OHIO

/s/ Stephen O'Bryan

Stephen O'Bryan

Margaret A. Cannon

Kelley, McCann & Livingstone

Cleveland, OH

/s/ Mark O'Neill

Mark O'Neill

Raymond S. Ling

Weston, Hurd, Fallon, Paisley, Howley

Cleveland, OH

Special Counsel to the Attorney General and the State Defendants

The foregoing Joint Stipulation and Agreement between counsel is hereby approved by the Court.

/s/Robert B. Krupansky

Robert B. Krupansky

United States Circuit Judge

United States Court of Appeals for the Sixth Circuit

Sitting by designation

EXHIBIT A

## STATE'S PROPOSALS FOR ALTERNATIVES TO THE PRESENT ASSIGNMENT REQUIREMENT

1.  Guarantee each child a desegregated assignment—to a school where pupil composition is expected to be within ±15 percentage points of the system's average.

2.  Permit parents to choose assignments to other schools.

3.  Ensure that magnet school assignments be confined to a range ±15 percentage points—and possibly narrower, to ±5 or perhaps ±10.

4.  Allow any pupil to transfer to a school whose composition falls within ±15 percentage points of the District average, regardless of the effect on the sending school.

5.  Encourage substantial representation of the major racial elements in each school, so that each child feels like a member of a meaningful, substantial community—and ensure that all schools will be at least one-third African–American.

6.  Permit some schools to exceed 90% African–American enrollments, if they are the products of parental choice.

7.  Eliminate long bus rides.

8.  Eliminate the necessity of children standing on street corners during hours of darkness waiting for bus rides.

9.  Take all reasonable steps to eliminate successive mandatory reassignments for racial balance.

10. Meet constitutional minimum standards.